ALLEN et al. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. October 17, 1924. Rehearing Denied February 16, 1925.)

No. 3322.

1. **Criminal law ⬾1159(3)—Appellate court will not determine weight of conflicting evidence.**

While Const. U. S. Amend. 5, guarantees accused a jury trial, he is not entitled to trial by jury and retrial by appellate court on any asserted distinction between evidence and substantial evidence, as basis for modifying the rule that, where evidence is conflicting, the issue is for the jury, and the appellate court will not weigh such evidence.

2. **Criminal law ⬾935(1), 1134(4) — Trial judge may set aside verdict on conflicting evidence and grant new trial; granting new trial on conflicting evidence is not reviewable.**

Trial judge may set aside verdict on conflicting evidence and grant new trial, and his action therein is not reviewable.

3. **Criminal law ⬾553, 742(2)—Weight and credibility of accomplice's testimony is for jury; accomplice's testimony alone may support verdict.**

Weight and credibility of accomplice's testimony is for jury, and such testimony alone may support verdict.

4. **Conspiracy ⬾45—In prosecution for conspiracy to violate National Prohibition Act, evidence of general vice throughout city held admissible.**

In prosecution under Criminal Code, § 37 (Comp. St. § 10201), of city and judicial officials and owners of soft drink establishments for conspiracy to violate National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), evidence of campaign contribution under fictitious names by operators of soft drink places, evidence as to frequency and character of prosecutions in city and punishment imposed, and evidence showing the maintenance of houses of ill fame wherein liquor was sold, properly admitted.

5. **Conspiracy ⬾47—May be established by circumstantial evidence, or by deduction from facts.**

Conspiracy may be established by circumstantial evidence, or by deduction from facts, and proof of written agreement is unnecessary.

6. **Conspiracy ⬾24—Person may become party to conspiracy by co-operation in furtherance of it.**

One knowing that others have combined to violate law, who co-operates knowingly to further object of conspiracy, becomes a party thereto, though he is not acquainted with each of the other conspirators, and may know but one of them.

7. **Conspiracy ⬾28—If any object of conspiracy is commission of offense, case falls within condemnation of statute.**

Though some of objects of conspiracy may be innocent, if one of them be to commit offense against United States, case falls within condemnation of Criminal Code, § 37 (Comp. St. § 10201).

8. **Conspiracy ⬾24—One may join conspiracy after formation, and by knowingly participating therein becomes party thereto.**

One may join a conspiracy after it has been formed, and by knowingly participating in conspiracy becomes party thereto as though he had conceived plot.

9. **Criminal law ⬾1043(1)—Admission of evidence objected to only by party who had not prosecuted writ of error not reviewable.**

On review of joint conviction of many defendants for conspiracy, admission of evidence objected to by but one defendant, who did not prosecute writ of error, held not reviewable.

10. **Witnesses ⬾52(7)—Exclusion of testimony of wife of one of defendants held not error.**

Exclusion of testimony of wife of one of defendants held not error.

11. Conspiracy ☜45—Criminal law ☜423(7)—In prosecution for conspiracy to violate liquor law, admissions made by unidentified woman in house of ill fame where liquor was sold held admissible.

In prosecution of many defendants for conspiracy to violate National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.), admission of testimony of newspaper reporter that he had visited soft drink parlors and homes of vice, where intoxicating liquors were openly sold, and testimony as to conversation had at one place with unidentified woman, relative to amount paid by her for protection, *held* not error, nor violative of substantial rights of parties, under Judicial Code, § 269 (Comp. St. § 1246); there being evidence sufficient to establish a prima facie case showing such woman to be a conspirator, rendering her admission receivable against other conspirators.

12. Criminal law ☜1036(1) — Admission of testimony is not reviewable, in absence of objection when offered.

Admission of testimony is not reviewable, in absence of objection when offered.

13. Conspiracy ☜45—In prosecution of city officials, lawyers, and others for conspiracy to violate Prohibition Act, record of city court, showing manner of handling liquor prosecutions, held properly admitted.

In prosecution for conspiracy to violate National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) of many defendants, including lawyers, who apparently had a monopoly of business affecting such matters at place involved, record of city court, judge of which was also defendant, showing manner of handling prosecutions, *held* admissible.

14. Criminal law ☜844(1)—Errors in instruction should be pointed out, when court still has opportunity to correct.

Errors in instruction should be specifically pointed out before jury retires, and court given opportunity of correcting its mistake or oversight, which requirement cannot be waived.

15. Criminal law ☜762(2)—In federal courts, judge may express opinion respecting weight of evidence, and discuss and comment thereon.

In federal courts, judge may express opinion respecting weight of evidence, and discuss and comment thereon, but is not required to do so.

16. Criminal law ☜811(2) — Requested instruction affecting evidence, standing, and reputation of one defendant held properly denied.

In conspiracy prosecution, instruction that "court has permitted you to hear evidence of the standing and reputation of the defendant J., for good character. That reputation alone may create a reasonable doubt of defendant J.'s guilt in your minds, and is proper for you to consider," *held* properly denied, as giving undue prominence and conveying possibly erroneous impression that character witnesses have favorably impressed court.

17. Criminal law ☜126(1), 591—Jury ☜116—Refusal of change of venue, continuance, and new panel, on ground of alleged prejudice from newspaper reports, held not error.

In prosecution of municipal officers, attorneys, and owners of soft drink places, refusal of continuance, change of venue, or new panel, on ground of alleged prejudice arising from newspaper reports of murder of one of government's principal witnesses, *held* not error.

18. Jury ☜100—Jurors' reading of something of facts in newspapers does not disqualify them.

Jurors are not disqualified, though they have read something of facts involved in newspapers.

On Petition for Rehearing.

19. Criminal law ☜622(1) — Proceeding to trial with 75 defendants held not error.

That court proceeded to trial with 75 defendants *held* not in itself error; question whether all indicted shall be tried at one time, or divided into groups, being a question addressing itself largely to discretion of trial judge.

Alschuler, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the District of Indiana.

Mary Allen and others were convicted of conspiracy to violate the National Prohibition Act, and they bring error. Affirmed.

Certiorari denied Mullen v. United States, 267 U. S. ——, 45 S. Ct. 353, 69 L. Ed. ——.

David D. Stansbury, of Chicago, Ill., for plaintiffs in error Blaz A. Lucas and others.

Stephen A. Clinehens, of Indianapolis, Ind., for plaintiffs in error Mary Allen and others.

James W. Noel, of Indianapolis, Ind., for plaintiffs in error Lewis E. Barnes and others.

C. B. Tinkham, of Hammond, Ind., for plaintiffs in error Bryan S. Narcovich and others.

Clair McTurnan, of Indianapolis, Ind., for plaintiff in error Clyde Hunter.

Moses B. Lairy, of Indianapolis, Ind., for plaintiff in error Roswell O. Johnson.

Alexander G. Cavins, of Indianapolis. Ind., for the United States.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Defendants, 75 in number, were indicted for an alleged violation of section 37 of the Criminal Code (Comp. St. § 10201), conspiracy; the indictment being set forth in five counts. A demurrer to the fifth count was sustained, and the remaining four charged defendants

with a conspiracy (a) to transport intoxicating liquor; (b) to sell intoxicating liquor; (c) to maintain a large number of nuisances in violation of the National Prohibition Law; (d) to "unlawfully ° * * * manufacture, transport, sell, possess for sale and barter, intoxicating liquor."

Of the 75 defendants named in the indictment, 7 were never arrested, 5 pleaded guilty before trial, and 63 went to trial. Of these 63, the court dismissed the case as to 1, 7 were acquitted by the jury, and 55 were convicted. Later, a motion for a new trial was granted as to 1, and 2 others were discharged on motions in arrest of judgment.

Judgments imposed upon the remaining 52 range from a penitentiary sentence of 18 months and a fine of $2,000, to imprisonment for 10 days. Forty-two of the remaining 52 prosecuted separate writs of error, though 3 of these have since served their sentences. The other 10 accepted the judgment, and have served their sentences.

Defendants have been grouped and divided by counsel into classes, and for convenience we adopt the classification:

"(a) The first group as disclosed by the evidence was composed of certain persons who held the office of justice of the peace, together with certain constables and other persons known as' 'high-jackers,' the chief of whom appears to have been Daniel Malloy, who was called as the first witness for the government.

"(b) Another group consisted of the sheriff of Lake county and his predecessor in office, together with numerous deputy sheriffs.

"(c) Another group consisted of the judge of the city court of Gary, the prosecuting attorney and his predecessor in office, and certain lawyers of the city of Gary, whose practice was largely in the city court.

"(d) By far the most numerous group of the defendants was composed of persons engaged in the ostensible business of operating soft drink parlors in the city of Gary, and who had been detected in the sale of intoxicating liquor."

The assignments of error are directed to (a) the sufficiency of the indictment; (b) the failure to grant a continuance; (c) failure to grant a change of venue; (d) failure to grant a new trial because of the undue influence of newspaper articles; (e) admissibility of evidence; (f) instructions to the jury; (g) failure to discharge defendants for want of proof to support a conviction.

While an effort to shorten the printed record, to avoid duplication of argument, and

lighten the burden of this court has been made, the case is one of innumerable difficulties. Various defendants and groups of defendants have submitted briefs, with the result that over 1,250 pages of printed briefs and arguments have been filed by them, and in each one it is earnestly contended that the evidence fails to disclose a conspiracy to violate the National Prohibition Act in any of the ways set forth in the indictment; and, secondly, that it fails to show guilty participation by any one of the defendants in the conspiracy, if one can be found.

It is admitted that the evidence may show guilty participation by certain of the defendants in a great number of criminal offenses, but it is denied that they participated in the particular conspiracy here charged.

[1] Before discussing the evidence, it may be well to point out that the rule laid down in Applebaum v. United States (C. C. A.) 274 F. 43, and frequently followed by this court (Holy v. United States, 278 F. 521; Grossman v. United States, 282 F. 790, 793; Wolf v. U. S., 283 F. 885, 888; Talbot v. U. S., 286 F. 21; Inks. v. United States, 290 F. 203), must govern us in determining whether there is present a jury question. It is of no avail for counsel to cite cases which have attempted to draw a distinction between "evidence" and "substantial evidence," or to point to an occasional decision where the appellate court weighed the evidence and reviewed the decision of the jury, upon a disputed issue of fact, for such is not the rule in this jurisdiction. The right of an accused to a trial by jury upon all issues of fact is guaranteed by the Fifth Amendment to the Constitution. But the accused cannot have both a trial by a jury, and a retrial by an appellate court. If the *evidence* be conflicting, then the issue is one for the jury, and no asserted distinction between *"evidence"* and *"substantial evidence"* can afford a basis for a modification of this rule.

[2] On a motion for a new trial, the District Judge may set aside the verdict and grant a trial, notwithstanding the evidence is conflicting. But his action in so doing or refusing to do so is not subject to review by this court.

[3] Another rule which can not be ignored in cases of this kind where the appellate court is asked to review the testimony to ascertain whether any evidence may be found to support the verdict, relates to the testimony of accomplices. However bitterly such testimony may be assailed before the jury, the fact remains that it alone may support

a verdict. Caminetti v. United States, 242 U. S. 495, 37 S. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168; United States v. Heitler (D. C.) 274 F. 401. Upon appeal its weight or credibility is not involved. Whether they, or any of them, were moved by revenge or any other unworthy motive, whether they told the truth in part or in whole, was for the jury to determine.

Evidently their testimony was believed, and, if accepted, a condition was disclosed as shocking as may be found in the annals of municipal government. They described a situation where, from police to mayor, from bailiff to the court, corruption was rampant, vice was protected, bribery was common, and justice was a mockery. Moneys were collected from the dens of vice to secure the election of officials who were or became the partners of the grafter, the moonshiner, and the operators of bawdyhouses. The "city judge," the central figure around whom the evil and corrupt activities revolved, was sentenced to the penitentiary and to pay a heavy fine, and he accepted the sentence, and has not prosecuted a writ of error.

But it is urged, and correctly so, that all these offenses against local laws and good morals, and the evidence which established them, were irrelevant and immaterial, unless they tended to establish the offense charged, and for which alone defendants were on trial. But was such evidence irrelevant to the issues presented by the indictment?

[4] Defendants were charged with a conspiracy to violate the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.). It was necessary to first establish the unlawful combination—the criminal partnership or association. But it is not necessary, in order to establish a conspiracy that the proof show a written agreement. It is seldom the parties entering into a criminal conspiracy reduce their agreement to writing or call in any one to witness it.

[5, 6] A conspiracy may be established by circumstantial evidence or by deduction from facts. The common design is the essence of the crime, and this may be made to appear when the parties steadily pursue the same object, whether acting separately or together, by common or different means, but ever leading to the same unlawful result. If the parties acted together to accomplish something unlawful, a conspiracy is shown, even though individual conspirators may have done acts in furtherance of the common un-

lawful design apart from and unknown to the others. All of the conspirators need not be acquainted with each other. They may not have previously associated together. One defendant may know but one other member of the conspiracy. But if, knowing that others have combined to violate the law, a party knowingly co-operates to further the object of the conspiracy, he becomes a party thereto.

It is true campaign contributions, in and of themselves, may be innocent acts. They may be prompted by the worthiest of motives. But large sums, collected chiefly from those who run so-called soft drink parlors, may become strongly suggestive of crime, when supplemented by testimony showing that after election the operators of these places engaged in the open and unrestricted sale of liquor. If the contribution was inspired by worthy motives, why was it necessary to falsify the names of the donors? Might not the jury have fairly concluded that the change in the name from a notorious dive keeper, or the proprietor of a house of ill fame, to one unknown, constituted an implied admission that this collection of funds to help win an election was not an innocent act?

Nor is the evidence that defendants exacted large tributes from those who were prosecuted, or that other defendants paid large sums as bribes, suggestive merely of an obstruction to or a burden upon an illegal traffic. Where an occasional raid, or an occasional prosecution, followed by a small fine and supplemented by liberal payments of protection money, divided among those who could and would determine the frequency and character of the raids and prosecution, was disclosed, the jury may well have concluded that it was all merely a part of the conspiracy as charged. Where a fine and a substantial jail sentence were clearly merited, is not a mere fine a leniency which the jury could say was in furtherance of a conspiracy to violate the law? In other words, do not such conditions tend to show that protection and no jail sentence for the offender constituted the agreement, under the protection of which the owners of soft drink parlors were to sell liquor and maintain common nuisances such as were condemned by the National Prohibition Act?

Defendants substituted for prohibition what was in effect a license system, the license fee being paid by some conspirators and divided by others, and it was in large measure based upon what the traffic would bear. Nor was the evidence showing the

maintenance of houses of ill fame, as distinguished from soft drink parlors, for which protection money was paid, immaterial. The evidence shows that, by whatever name these places might go, they were conducted in part for the profit incident to the sale of intoxicating liquor.

[7] The fact that other crimes and offenses may also have been within the contemplation of the operators cannot relieve the defendants of the offense here charged. For the objects of a conspiracy may be numerous. Some may even be innocent, but, if one of such objects be to commit an offense against the United States, the case falls within the condemnation of the statute. Taylor v. United States (C. C. A.) 2 F.(2d) 444. Where individuals agree or have a common understanding to grant to those selling intoxicating liquor immunity from prison sentence, the case is brought within the statute, for such immunity has for its real object the maintaining of common nuisances as defined by the Volstead Law, as well as the manufacturing, transportation, and sale of intoxicating liquors.

But on behalf of that larger group designated (d) above, it is urged that the evidence merely showed they sold liquor, and that there is no proof of their guilty participation in the conspiracy charged. It is true, if there be no other evidence than the mere sale of liquor, the conspiracy is not shown. Heitler v. United States (D. C.) 274 F. 401. But did these defendants *merely* sell liquor? What of the evidence showing their campaign contributions, their payment of protection money, and payment of graft money when arrested? The open and flagrant manner in which they conducted their business refutes their professed innocence. They did not need to know all the details of the plot, nor all the means whereby the objects were to be accomplished. All of them were actors, though some played but a minor or insignificant part in the plot. The enterprise called for pawns as well as kings—the human wrecks found in the houses of vice as well as the highest public officials in the city. All the jury was required to find was a guilty participation, knowingly undertaken. The degree of moral turpitude was immaterial.

[8] It was frequently and plausibly argued in the various briefs that, at most, the evidence showed various conspiracies, which terminated before several of the defendants appeared upon the scene. But one may join a conspiracy after it has been formed, and, if he participates knowingly, he becomes a party thereto just as though he conceived the plot. One actor may drop out of the scene altogether, and another take his place, without the conspiracy terminating. Commenting upon this issue, the trial judge said to the jury:

"It is my opinion, upon the evidence here —and which opinion you need not accept, unless you see fit to do so upon your examination of the evidence—that, if the evidence of the government is to be believed, there certainly was at some time a conspiracy of the character described in the indictment. And the task that is committed to you, if you find that to be the fact, is that of determining the membership of that conspiracy. * * * I do not believe that there is any doubt here, if the testimony of the government is accepted, but that there is shown to have been an unlawful confederation, at some time, of some sort of membership, during the period disclosed by the indictment."

This statement is significant. Not only did the judge who sat through the long trial, and heard and saw all of the witnesses, conclude that there was a question for the jury, but he was firmly convinced of the existence of an unlawful conspiracy such as was charged in the indictment. If we were otherwise in doubt, which we are not, this statement of the trial judge would necessarily be most persuasive. We think the trial judge fairly stated the position of the various counsel when he said that they question the sufficiency of the evidence to connect their clients with the conspiracy rather than the existence of the conspiracy.

In view of the very earnest argument made on behalf of several individual defendants, notably Johnson and Kinder, we make a brief statement as to them. The testimony of accomplices, and particularly the testimony of Melloy and Ukman, makes it impossible for this court to set aside the verdict of the jury. It would hardly require testimony other than Ukman's, if believed, to convict several of the leading defendants. For responsible, innocent men do not participate in a midnight session with one who is a witness against them, strip him and brutally beat him, in an effort to get him to sign a statement which he says was false.

Reconciliation of defendant's innocence with this story is impossible. Defendants' innocence can only be upon the hypothesis that Ukman's story is false. And there are some circumstances surrounding the arrest and persecution of Ukman which the jury might well have viewed with suspicion. The unseemly haste and the vigor displayed by

officials who were notorious for their laxity, undertaken immediately upon the discovery that Ukman was working with the government to uncover the evidence which connected defendants with the offenses here charged, is most significant, and not satisfactorily explained. Nor could it be said that the accomplices' testimony was entirely uncorroborated. In many instances their testimony was strongly corroborated, while in other respects it fitted in with stories given by others.

Concerning defendants Lucas and Narcovich, as well as numerous others, we will pass without entering upon a detailed discussion of the evidence. Their guilt is established, if the testimony of certain accomplices be accepted. Whether the accomplices spoke the truth was for the jury alone to decide.

[9] Respecting the rulings on evidence, several assignments call for special consideration. One witness, Bridget Dunlavy, testified in substance that she on one occasion was called on the telephone by the defendant Judge Dunn, and warned of an approaching raid, and asked to notify her sister thereof. She stated that she did not know Dunn's voice, but that the speaker said he was Judge Dunn. Granting for the moment that defendant Dunn, who alone objected, could insist that the voice be first identified, a sufficient answer to this assignment lies in the fact that Dunn is not complaining. He is not before this court, not having prosecuted a writ of error.

But there was other and connecting evidence. The witness' sister testified that she had been previously arrested for operating a still, had been fined by Judge Dunn, to whom she paid a bribe, *and without objection* stated that she had been raided later, but had been "tipped off by Judge Dunn through her sister before the police arrived."

Another witness was Mrs. Smith, who testified that one Dan Melloy was rooming at her "hotel," and dealt extensively in liquors. Melloy was one of the principal conspirators, who testified at length for the prosecution. Mrs. Smith said that she heard one end of a telephone conversation held by Melloy with another party. She heard Melloy call "Judge" and tell him that he had some fine liquor, which, if desired, would be brought over. No objection was made, save by Judge Dunn, who is not here complaining. Moreover, the testimony of Melloy shows him to have been the negotiator between Judge Dunn and the operators of soft drink parlors; that, when liquor was confiscated, Melloy obtained it and then sold it, dividing the proceeds among certain defendants, of whom Dunn was one. Under the circumstances, no error was committed.

[10] Mrs. Hunter, wife of one of the defendants, was offered as a witness, but was not allowed to testify, and error is assigned. This ruling was correct. Slick v. United States (C. C. A.) 1 F.(2d) 897; Jin Fuey Moy v. U. S., 254 U. S. 189, 41 S. Ct. 98, 65 L. Ed. 214.

[11] A witness, Harold Cross, testified that he, as a newspaper reporter, was seeking evidence one night to expose the crime so common in the city, and went to soft drink parlors and to the homes of vice, at which places intoxicating liquors were openly sold. His testimony covers his visits to numerous places, in practically all of which he saw intoxicating liquor drank and sold openly. Among other places visited was the Green Mountain Inn, where he talked with a woman behind the bar, whose name he could not give. The objection to this testimony was limited to that which occurred at this particular place. The witness said in substance that the woman behind the bar told him that she had a couple of girls, but that protection was too high; that she had to pay $100 a month to the collector. She was asked who was the collector, and declined to say. He said, "Who does it go to—the police?" and she said, "It goes to the man higher up."

To this objection was made, but upon the suggestion from the court that she was possibly one of the conspirators named or referred to in the indictment, *the objection was withdrawn.* Continuing he said: "How many prostitutes are there in Gary?" She said: "Three or four hundred. They all pay for protection." Examining the record we find that, after the previous objections had been withdrawn, one of the attorneys objected, stating, "We object to that as guesswork, and an opinion." The court replied that the question called for the entire conversation with a conspirator.

Aside from the estimate of the number of prostitutes in Gary, the testimony was only a repetition of what had been given by other witnesses, and, save for the amount required to be paid for protection, may well be said to be an established and uncontroverted fact. It was after the testimony had been given that different counsel apparently agreed upon the form of objection, viz.: "It was based solely upon the ground that the declaration was made out of the presence of any of the alleged conspirators."

That the woman was one of the co-conspirators was, we think, a matter which the

jury could fairly have found. Certainly there was a prima facie case made out showing her to be a conspirator. That being the situation, her admission was receivable as against other conspirators, it being made while the conspiracy was in force, and otherwise pertinent. The fact that she was speaking of protection, when the offense charged referred to a violation of the National Prohibition Act, would have required its exclusion, were it not for the fact that the record is full of testimony showing that in all of these houses of ill fame the sale of liquor was well-nigh universal and a part of the business therein conducted.

[12] The reception of the testimony of Jennie Poppa is charged as error. Aside from the reasons given by the trial judge, it appears that no objection was made when such testimony was offered, and it was too late to make an objection after the witness was excused.

[13] The record of the "city court" was offered in evidence to show the number of liquor cases handled by different lawyers. Certain lawyers who were named as defendants apparently had a monopoly of the business. The number of times they appeared was relatively large. Various witnesses were then called, who testified that they had employed these lawyers, and fixed the amounts paid by them to the attorneys. The judgments pronounced in their cases were then shown from the court records, and it was at least inferable (the cases being disposed of on a plea of guilty) that these defendants had some connection with the alleged conspiracy.

This evidence was not only relevant, but rather persuasive. For, if the issues be narrowed to Lucas' participation in the conspiracy, is not his conduct in handling the cases, disposing of them in his office, and later in court, without his clients being present, a matter that called for explanation? If one, accused of crime punishable by imprisonment and fine, consults an attorney and is told, "Give me $250, and it will be all square," and that is followed by the case being disposed of without trial and without the accused's further appearance, and by the imposition of a fine of $100, and this practice is followed in a majority of some 100 cases in a short period of time, would not the jury have been justified in finding that Lucas was a party to the conspiracy?

Little need be said of the instructions. They were eminently fair, and fully covered the issues. Such criticisms as are now made arise from the failure of the court to give certain proposed instructions in the exact words submitted. Defendants, except in two minor respects, acquiesced in the charge at the time of its pronouncement.

Several counsel, however, asked the court to give proposed instructions by them submitted and which were not included in the court's charge. No single instruction which the court failed to give was thus pointed out, neither was the insufficiency of the charge on any subject suggested. It is now urged, however, that the language of the judge bearing upon good character witnesses was not as specific as certain requested instructions, and reversible error was thereby committed.

[14] Errors in the instructions should be pointed out specifically before the jury retires, and the court should be given an opportunity of correcting its mistake or oversight. This rule is dictated by public policy, and prevents new trials and unnecessary expense. Neither the counsel by stipulation nor the court should forego this requirement. In fact, it has been held that it cannot be waived. Beaver v. Taylor, 93 U. S. 46, 23 L. Ed. 797; United States v. U. S. Fidelity Co., 236 U. S. 529, 35 S. Ct. 298, 59 L. Ed. 696; Jones v. East Tenn. R. R. Co., 157 U. S. 683, 15 S. Ct. 719, 39 L. Ed. 856; Conn. Mut. Life Ins. Co. v. Union Trust Co., 112 U. S. 260-261, 5 S. Ct. 119, 28 L. Ed. 708; Phœnix Assur. Co. v. Lucker, 77 F. 248, 23 C. C. A. 139; Buckeye Powder Co. v. E. I. Du Pont De Nemours P. Co., 223 F. 887, 139 C. C. A. 319.

We have, however, examined the alleged insufficiency of the charge to determine its error. In this respect we find no request, save from the defendant Johnson. Other plaintiffs in error, therefore, have no cause for complaint. Johnson requested the court to charge the jury respecting this testimony: "The court has permitted you to hear evidence of the standing and reputation of the defendant Johnson for good character. That reputation alone may create a reasonable doubt of the defendant Johnson's guilt, in your minds, and is proper for you to consider." The court charged the jury as follows: "Certain testimony has been introduced in this case, on behalf of some of the defendants, in support of their previous reputation as being law-abiding citizens, and for honesty and integrity. The law requires that the jury should consider that evidence and give it such weight as they see fit. I wish to caution you, however, that the mere circumstance that a person has borne a good reputation prior to the time when he was

accused of complicity in a crime, should not be used by the jury as a means of excusing the commission of the crime, or of showing leniency to one whom the evidence, otherwise, in connection with his evidence of good reputation, thoroughly satisfies the jury of the matter of his guilt." Inasmuch as support for this assignment of error is found in Snitkin v. United States (D. C.) 265 F. 489, 491-492, it may be well to consider and review the effect of that holding by a divided court.

[15] The proposed instruction is, generally speaking, a charge relating to the weight of certain evidence. While in federal courts the judge may express his opinion respecting the weight of evidence, and discuss and comment upon the evidence (and this right is generally recognized as a valuable aid to the administration of justice), no cases have been cited and none have been found where the court is required to express his opinion thereon. Certainly none can be found where the language is carefully considered which compels him to comment favorably upon certain testimony—much less to weigh the testimony and determine whether it equals or exceeds some other testimony.

How could certain testimony in one case be fairly compared with testimony of like character by different witnesses in another case? Referring to the particular subject-matter—character witnesses—it is needless to say that the probative value of such testimony varies widely. Not only may character witnesses be themselves obviously devoid of character, but they may have possessed such scant opportunity for forming an intelligent opinion as to render their testimony valueless. They may be biased, prejudiced, or interested. One character witness alone in one case may be more persuasive than six in another case. No hard and fast rule exists which fixes the number of such character witnesses that may be heard in a given case. Would the proposed instruction be necessitated if but one character witness was offered? Moreover, such testimony grows to large importance in one case, while in another it is inconsequential.

The decision in Edgington v. United States, 164 U. S. 361, 17 S. Ct. 72, 41 L. Ed. 467, does not support such instruction. There the only question arose over a charge that limited the effect of character testimony to cases where great doubt existed.

[16] The vice of the language in the proposed instruction lies in the fact that it gives undue prominence to evidence which in some cases is unwarranted, and erroneously conveys to the jury the impression that such character witnesses have favorably impressed the court, when such may not have been the case. We think the instruction given by the trial judge was entirely correct, and no error was committed in refusing to give the proposed instruction.

[17] The most serious assignment of error —one in which all defendants join—arises out of the publication of certain newspaper articles. While the court was engaged in the trial of the case newspapers of Indianapolis, following an altogether too common practice, also tried the case, acting as investigator, prosecutor, and judge. Whether the verdict following the long trial shall now be set aside and a new trial ordered, and the large expense to the government and defendants duplicated, depends upon our conclusion respecting the effect of these newspaper articles.

The trial was featured because of the political prominence of some of the defendants, but it became "real news" when, the night before the trial began, one of the principal witnesses for the government, an accomplice, so it was stated, was shot and killed. In view of the articles appearing in the papers following this murder, certain defendants sought a continuance, a change of venue, dismissal of the jury panel, and otherwise saved their right to review the question. Almost simultaneously with the report of the murder of the government's witness, there appeared what purported to be the district attorney's views of the murder, and a statement of what he intended to do to prevent intimidation of government witnesses. Extracts from the articles are printed below.[1]

---

[1] From the Indianapolis Star, Wednesday morning, March 13, 1923:

"Star Witness in Gary Booze Case Slain;
Blame Wets.

"U. S. Tried to Protect Monte, but He Scorned Aid, District Attorney Says—

"Others to Be Guarded.

"Elliott 'Not Surprised.'

"Army of Agents to Be Hired by Government —Armed Men to Patrol Court Environs.

"Protection of the federal government will be thrown around all government witnesses and every precaution to safeguard and prevent tampering with government witnesses or agents will be taken in handling the trial of the seventy-five Lake county defendants which will be called tomorrow, United States District Attorney Homer Elliott said, following receipt of news later yesterday of the killing of Gasper Monte of Gary, one of the 'star' witnesses for the government in the Lake county booze and fraud cases.

"Mr. Elliott expressed the belief that Monte

The injury of which defendants complain is due to (a) the charge or insinuation that the defendants were responsible for the murder of the chief witness of the government;

had been slain on account of the testimony he was expected to give in the prosecution of the Lake county defendants.

" 'I am not surprised to hear that Monte has been killed, for I have been expecting to hear of just such violence,' commented Mr. Elliott.

### "Refused Protection.

" 'We have tried to protect him and have made offers of protection, but Monte obstinately refused and boasted that he would be able to take care of himself.

" 'I received a long distance call from George Winkler, Indianapolis prohibition agent, who was at Hammond, telling me that Monte had been murdered. Winkler said he would go to Gary and make an investigation of the killing. The action only bears out my belief that the Lake county defendants are a desperate bunch and that the government must not spare any pains to safeguard the witnesses and agents who are connected with the case, which comes up for trial Wednesday morning before Judge Geiger.'

"Mr. Elliott said that Monte was a bootlegger, who had aided the government in perfecting its case. He said that Monte had valuable evidence, documentary and otherwise, which the government expected to present during the trial.

### "Guards in Court.

" 'We are going to increase our force and throw around every government witness a net work of guards and agents who will see that no one interferes with them during the progress of the trial,' said Mr. Elliott.

" 'We will take steps to patrol the corridors of the federal building during the trial, guards armed with guns and with orders to prevent any tampering with witnesses. These guards will also watch all witnesses in the streets and at the local hotels during the trial to see that no harm comes to them.

" 'Foreign speaking guards from other states will be brought into the city and to Gary to prevent any one from approaching the witnesses in any way. One man was arrested recently at Gary for attempting to tamper with a government witness.'

"Mr. Elliott said that another government witness, Tom Keussis, and Mrs. Keussis, had been attacked Saturday night at Gary, presumably because of their connection with the case."

From the Indianapolis Times, Tuesday, March 13, 1923:

"Armed Guards will Patrol Federal Court During U. S. Probe of Gary Liquor Ring.

"Government Acts after Star Witness is Shot Down in Street.

"Federal building corridors will resemble an armed camp when the Gary liquor conspiracy case goes to trial in federal court Wednesday, officials said to-day.

"News of the murder of Gasprai Monti, one

(b) the action of the district attorney in giving false and misleading information to the newspapers.

The course that should be pursued un-

of the star witnesses for the government, at Gary late Monday, stirred federal officials.

"Monti according to dispatches, was shot to death on the street by two men armed with sawed-off shotguns.

### "Guards will Patrol.

"A network of armed guards and government agents will be thrown around government witnesses and the corridors of the federal building will be patrolled throughout the trial, Homer Elliott, United States district attorney said.

"As part of the plan to prevent witnesses from being intimidated, Elliott said guards speaking the native tongues of foreign witnesses will be brought to Indianapolis.

"Elliott said two other government witnesses, Tom Keussis and his wife, were attacked Saturday at Gary.

### "Shuns Offers of Protection.

"Several attempts to assassinate Monti were made during the past year it is said. He recovered recently from a bullet wound which he had said was accidental.

"Offers of protection were made to him by federal authorities, but Monti spurned them and insisted he was able to take care of himself.

"Seventy-five defendants are named in the indictment which charged conspiracy to violate federal prohibition laws.

"Roswell O. Johnson, mayor of Gary, William Dunn, city judge, and other Gary and Lake county officials are among those indicted.

"After scores of the followers of Monti, known as the 'king of little Italy,' have been questioned by federal and local authorities at Gary, it was announced the officials did not believe the shooting had anything to do with Monti's testimony in the liquor cases.

"Attempts had been made to kill Monti several times before, it was said."

From the Indianapolis News, Tuesday evening, March 13, 1923:

"Witness Believed Black Hand Victim.

"Caspar Monti Shot to Death by an Unidentified Assailant in Street at Gary.

### "Liquor Cases Involved.

"Dead Man Was to Have Given Important Testimony at Trials of Judge and Attorney.

"(Special to the Indianapolis News.)

"Gary, Ind., March 13.—An hour after the funeral of Tony Cucinella yesterday, in which hundreds of Italians marched behind the supposed Black Hand victim, Caspar Monti, star witness for the federal government in the cases of Judge William M. Dunn and Blaz Lucas, an attorney, charged with conspiracy to obstruct the enforcement of the prohibition law, was shot to death by a person whose identity the police have not learned, although the Black Hand is believed responsible.

"It was the fourth time Monti had been shot. Monti, who is proprietor of a soft drink place,

der such circumstances must depend on the facts in each case. How the courts can or should meet the situation, constantly growing worse, where newspapers, hungry for sensational news, print prejudicial statements, often not remotely accurate, which may and generally do come under the observation of prospective jurors, is a serious question for those conducting the trial of criminal cases. Too frequently counsel for the government loan their evidence, or parts of it, to the press, and the case is first tried in the paper before action is begun in the courts. In so doing, the prosecutor makes a serious mistake, one that cannot be too severely condemned.

So far as the newspapers are concerned, after the trial has begun, the court can "lock up the jury" and keep papers from them. But such a course is a hardship on innocent parties. Surely the conscience of the press should arouse itself, and a truce be entered into between competing papers, whereby the race for sensational news may be suspended during the trial, so that the 12 men who

must determine the guilt of the accused may do so upon competent evidence.'

More reprehensible is the conduct of a prosecuting attorney seeking notoriety. Where it appears that a prosecuting attorney gave out to newspapers, in advance of trial, misleading or prejudicial statements, which he knew would ordinarily reach prospective jurors through their publication, the court is often called upon to grant a new trial. It should be said of the present case that it does not appear that the district attorney was guilty of such conduct. The furthest the affidavits go is to suggest that newspapers put statements in the mouth of the government attorney which he did not deny.

Fortunately the articles appeared before any jury was drawn. So far as they told of Monte's murder, nothing was related that was not proved upon the trial. As to the cause of the murder, and the identity of the murderers, it was not a matter involved in the trial of this case. The jurors were fully examined in respect to their qualifications, and with reference to these murder stories. Some

---

had just left the Italian Civic Club and crossed an alley to go to his home when a man drove up in an automobile and opened fire. Both barrels of a sawed-off shotgun were discharged and Monti fell, fatally wounded. The gun was charged with slugs as big as a man's thumb, some of which struck Monti in the head.

### "Affidavits Against Officers.

"Monti signed federal affidavits last fall charging Dunn and Lucas with promising him and others who had been accused of violating the liquor law, with protection. The judge and Lucas were arrested and released under bonds of $5,000 each. When the recent blanket indictment was returned by the federal grand jury at Indianapolis, the names of Dunn and Lucas were included in the list of seventy-five Gary and Lake county persons charged with conspiring to violate the prohibition law.

### "Shot Several Months Ago.

"Several months ago Monti was mysteriously shot and was in a hospital for a long time. At that time he said that he had been 'fooling with a gun' that had been discharged accidently. Although police scouted this explanation of the shooting, they were unable to get any clews to show intent to kill Monti and the case was dropped.

"Twice before Monti was attacked by assailants, who left no clews. Again a bomb was placed under his house and the front of the building was blown out. Monti was not in the house at the time.

### "Third Black Hand Death.

"Monti had been arrested several times on charges of violating the liquor law. Monti's death was the third in the Italian colony here which police attribute to the Black Hand Society. Tony Cucinella was murdered Thurs-

day night, and a few months ago his cousin, Joe Cucinella was found on the road to Michigan City, his body riddled with bullets.

### "Serious, Says Elliott.

### "U. S. Attorney Discusses Situation in Gary Liquor Cases.

"The situation growing out of the indictment of seventy-five Lake county residents on a charge of of conspiracy to violate the liquor law is serious from the standpoint of witnesses, Homer Elliott, United States district attorney, said today. He said that the killing of Gasper Monti did not surprise him, as he had been expecting something of that sort ever since the indictment was returned. He said that recently he sent men to Gary to guard Monti, but the latter refused assistance, saying that he could take care of himself.

"Trial of the conspiracy case begins to-morrow before Judge Ferdinand A. Geiger, of Milwaukee. The district attorney expects the trial to continue at least two weeks. Monti's testimony constituted an important link in the government's chain of evidence. Some of Monti's evidence, however, can be presented in documentary form, Mr. Elliott said.

"Speaking of the care of other witnesses, Mr. Elliott said:

"'We are going to increase our force and throw around all government witnesses a network of guards and agents who will see that no one interferes with them in the progress of the trial. We will take steps to patrol the corridors of the federal building during the trial with guards armed with guns who have orders to prevent any tampering with witnesses. Foreign speaking guards from other states will be brought into the city and to Gary to prevent any one from approaching the witnesses in any way.'"

of them had read the articles in question, while others did not know of Monte's death until defendants' counsel asked them concerning its effect upon them. Others read the headlines, but were not interested. In exercising their peremptory challenges, or "strikes," defendants seemed not concerned about it, for they peremptorily "struck" some who had not read the articles, and accepted without examination one who had read it. They did not exhaust all their peremptory "strikes," and challenged no juror for cause because he had read such articles. *In fact, many of the defendants did not join in the motions for a continuance, change of venue, or join in the demand for a new panel,* and certainly as to them there exists no such assignment of error.

Moreover the court was not justified in ignoring their wishes when it denied a continuance. Had the case been continued, the effect of the murder of the government's principal witness would have doubtless been as impressive at a later date as it was at the time of the trial.

[18] Jurors are not disqualified, though they have heard something of the facts through the newspapers. Reynolds v. United States, 98 U. S. 145, 155, 156 (25 L. Ed. 244): "The theory of the law is that a juror who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have that effect. In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits. It is clear, therefore, that upon the trial of the issue of fact raised by a challenge for such cause the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence. The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest. No less stringent rules should be applied by the reviewing court in such a case than those which govern in the consideration of motions for new trial because the verdict is against the evidence. It must be made clearly to appear that upon the evidence the court ought to have found the juror had formed such an opinion that he could not in law be deemed impartial. The case must be one in which it is manifest the law left nothing to the 'conscience or discretion' of the court."

One cannot read the testimony of the 12 men given on the voir dire without being satisfied that they entered upon the trial of this case uninfluenced by the newspaper articles. They came from various and widely scattered parts of Indiana. They knew neither the defendants nor the government's witnesses. They came from various walks of life, and all unqualifiedly announced that they had no opinion respecting defendants' guilt and were not conscious of any bias by reason of anything that they had seen, heard, or read.

This presents a different situation from one which arises where a prejudiced or highly inflammable newspaper article reaches the jury after the case has begun, or when the jury is deliberating upon its verdict. In most of the cases cited by defendants, the sensational newspaper articles appeared after the jury was drawn. There was no opportunity for the court to ascertain whether any juror had been prejudiced. Even under such circumstances, the granting of a continuance is largely a discretionary matter with the trial judge. In the present case, we cannot say there was any abuse of discretion.

Other assignments of error we have considered, and have reached the conclusion that they do not merit separate discussion.

The judgment is affirmed.

### On Petition for Rehearing.

After a careful examination of the numerous briefs, filed in support of the various petitions for rehearing, we are convinced that they should all be denied. In the trial of a case involving many defendants, lasting as long as this one, many questions arise. We confess to have experienced some difficulty in gathering and classifying the facts upon which the assignments of error are predicated. We trust we have not consumed too much time in going over the records and briefs and reaching our conclusion.

[19] While it might have been more satisfactory to both the trial court and to ourselves, had there been a smaller number of defendants indicted, we are not prepared to say that error was committed in proceedings to trial with 75 defendants. Neither the court nor the prosecuting attorney can fix or limit the number of persons who engage in

a conspiracy to commit an offense against the United States. The action of the grand jury must be based upon the facts. A condition rather than a theory confronts it.

Whether all who are indicted should be tried at one time, or divided into groups, is a question that must address itself largely to the discretion of the trial judge. On the one side, there is the justifiable desire to avoid a repetition of trials, while, on the other hand, the number should not be so great as to necessarily confuse a jury, or make an intelligent or discriminating verdict impossible. The difficulty of the trial judge in attempting to make a classification of defendants, where many are on trial, is at once apparent. Likewise the unwillingness of certain defendants to be classified in one group or another must be considered.

In the present case it seems to us to have been a matter that added to the burdens and responsibilities of the trial judge rather than one of which any plaintiff in error can complain. In other words, had there been fewer defendants, it is not at all unlikely that the government would have concentrated its efforts more directly and effectively upon each one of the accused. Plaintiffs in error, on the other hand, had many lawyers, who devoted their energies and directed their attention to individual rather than to all defendants. There is at least some support for the conclusion that the defendants were benefited rather than handicapped by being tried together.

Were we otherwise in doubt respecting the rulings of the court on the admission of evidence and the exceptions taken thereto, illustrated by the testimony of Harold Cross, we would be constrained to hold, under section 269 of the Judicial Code (Comp. St. § 1246), that "the substantial rights of the parties" were not affected by such rulings, and the judgment should be affirmed.

Petitions for rehearing are denied.

ALSCHULER, Circuit Judge. While concurring in the foregoing respecting the petitions for rehearing herein, I feel constrained to say that in my opinion the testimony of Harold Cross as to the conversation at the "Green Mountain Inn" ought not to have been admitted, or, having been admitted, should have been excluded, when (as I believe was the case) the evidence failed to connect with the alleged conspiracy to violate the National Prohibition Act the unidentified woman with whom Cross had the conversation to which he testified. This conversation was only a thread in the entire fabric of the evidence which revealed the conspiracy, and while in some cases the error of its admission or retention might have been serious, it was here of such comparative unimportance as in my judgment to require the conclusion that it did not work appreciable injury to the defendants, and cannot serve to vitiate a judgment which upon the entire record seems but the pronouncement of substantial justice.