**UNITED STATES v. DIRECT SALES CO.,**
Inc., et al.
No. 8460.

District Court, W. D. South Carolina.

April 27, 1942.

624

Oscar H. Doyle, U. S. Atty., E. P. Riley and Thomas A. Wofford, Asst. U. S. Attys., all of Greenville, S. C., for United States.

William B. Mahoney, of Buffalo, N. Y., for defendant Direct Sales Co., Inc.

J. M. Nickles, of Abbeville, S. C., for defendant Dr. John Victor Tate.

WYCHE, District Judge.

The indictment in this case charges the defendants with a conspiracy to violate the Harrison Narcotic Act. The defendants Black and Johnson entered pleas of guilty. During the trial the defendant Foster suffered a heart attack and by consent, a mistrial was ordered in the case as against him, and the trial proceeded against defendants Tate and Direct Sales Company.

At the conclusion of the testimony, a motion was made for a directed verdict of not guilty on the ground that the evidence was insufficient to support the charge in the indictment. The motion was overruled and the jury returned a verdict of guilty. The case is now before me on motion for new trial on the ground that the verdict is contrary to the law and the evidence; that the Court erred in not directing a verdict of not guilty; and upon other grounds which have already been disposed of on the motion to quash the indictment.[1]

The testimony discloses that Direct Sales Company is a corporation, having its principal place of business at Buffalo, New York, and is a manufacturer of and a wholesale dealer in drugs, including narcotics, and at the times mentioned in the indictment was registered as such under the provisions of the Harrison Narcotic Act. Dr. John Victor Tate is a physician residing at Calhoun Falls, South Carolina, and was at the times mentioned in the indictment, registered under provisions of the Act in his proper class. The defendant Johnson was a resident of Augusta, Georgia, and defendants Foster and Black were residents of Spartanburg, South Carolina. Neither of them had been registered or had paid the special tax in any class under the provisions of the Act.

The Direct Sales Company, as its name implies, sells directly to the customer. It has no traveling representatives. It solicited the business of Dr. Tate by means of catalogs and circulars sent to him every ten days. The catalog used by this defendant is an ordinary pamphlet printed in black type on white paper, and a great number of preparations are listed in it. Narcotics, however, are not listed in the catalog itself. This defendant's uniform practice, during the period alleged in the indictment, was to insert into the catalogs a sheet of paper approximately four inches wide by five and one-half inches long, sometimes colored pink and sometimes blue, on which was listed morphine sulphate. It offered tablets of morphine sulphate for sale in lots of five hundred, one thousand, and five thousand, one-quarter and one-half grain tablets. The prices were from thirty to forty per cent. less than could be obtained elsewhere.

There was expert testimony by competent witnesses that the standard dose of morphine was from one-eighth to one-quarter grain, and in rare instances, one-half grain; that it is administered to alleviate pain and as a sedative, and that codein is also used for such purposes. Dr. Blake who testified as a witness for the government, said he used one hundred codein tablets to one of morphine.

Narcotic Agent Bransky went to the offices of the Direct Sales Company in August, 1936, and told the officers of the

[1] United States v. Direct Sales Co., Inc., et al., D.C., 40 F.Supp. 917.

company that he had been sent there by the Commissioner of Narcotics, because large quantities of narcotics which the company had been selling to registrants throughout the United States had been diverted into unlawful channels, and he asked their cooperation to curb such diversion. The officers replied that they had only sold to registrants on order forms, and had no way of knowing what disposition was being made of the drugs. Bransky told them that it was his experience as an officer that when a physician ordered one-half grains of morphine sulphate, it could be assumed that it was to be used for other than legitimate purposes, and was being dispensed to satisfy addiction in violation of law. He told them that it was his experience over a long period of years as an investigator, that the average physician throughout the United States would purchase from two hundred to four hundred one-quarter grain tablets of morphine sulphate in one year. He showed to the officers of the company a list of two hundred and four names of class 4 registrants who had been convicted of violations of the narcotic laws. By permission of the company, he investigated its records and informed the president of the company at that time that of the two hundred and four physicians who had been convicted for violations of the narcotic laws in the United States, fifty-five of them were customers of this defendant. This witness called the attention of the president of the company to his catalog listings, and told him some of the best known companies listed morphine in lots not to exceed one hundred one-quarter grain and half grain tablets, and that the Direct Sales Company was listing in lots of five hundred, one thousand and five thousand. Later the company's listings were changed to show lots of five hundred and one thousand. He asked the company to limit the amount to be sold on one order form to one thousand one-half grain tablets, to which this defendant agreed. He did this, as he said, in a spirit of cooperation, as he had no authority under the law to demand it. In the year 1936, he testified that the president of the company told him he had ordered five thousand ounces of morphine. The Direct Sales Company does an annual gross business of from $300,000 to $350,000, and the Government contends that its principal business is dealing in morphine.

He said that the officers of the company promised to revise its catalogs so as not to show lots of five thousand tablets, and that they would not sell on one order form more than one thousand one-half grain tablets, and so far as he knew they had kept their promise. It was shown that the purpose of the agreement to discontinue catalog listings of lots of five thousand tablets, and the agreement to limit to one thousand tablets the quantity to be sold on one order form was to reduce the amount going out to physicians and thus reduce the amount being diverted into unlawful channels. The Commissioner also asked the company to discontinue the giving of discounts on narcotics in order further to reduce the flow to class 4 registrants. The company complied with this request, but immediately listed prices with the discount already figured off. Dr. Tate was submitting order forms for one thousand half-grain tablets of morphine sulphate on an average of every five days, and in the latter period more often. All of his orders were for one thousand one-half grain tablets, with the exception of one submitted on June 28, 1939, in which he ordered one thousand one-half grain tablets and one hundred one-quarter grain tablets. On that occasion the company filled his order for the one thousand one-half grain tablets, and wrote a letter to him requesting him to submit another order form for the remaining part of the order. It was contended by the Government that this letter, while informing Dr. Tate of the rule that only one thousand tablets could be ordered on one order form, that it also suggested to him that all he needed to do was to split his purchase up into different order forms, and that the letter was so understood by him, as shown by his orders for the succeeding thirty days, during which he ordered six thousand one-half grain tablets, or one thousand more than in any other thirty-day period.

 The president of the company testified that he knew the only way Dr. Tate could dispose of the morphine sulphate he ordered was by direct administration to his patients in the legitimate practice of his profession. This, of course, is the law. He could neither sell nor give it away. Dr. Tate was ordering one thousand one-half grain tablets at a time. One-half grain tablets, it was testified, are rarely used in the practice of medicine, but are

frequently used by addicts. These orders came with regularity and it was shown that on many occasions one order was in the mail coming to Dr. Tate while his order form for another lot was on the way to Direct Sales Company. With negligible exceptions, Dr. Tate ordered no other preparations from the Direct Sales Company, and he ordered no codein. The company was bound to know that the volume of morphine being used by Dr. Tate could by no stretch of the imagination be dispensed by him in the course of the legitimate practice of medicine, and must, therefore, have known that he was diverting it into unlawful channels, particularly after it was told that 26.96 per cent. of all convicted physicians in the United States were its customers, who had likewise been ordering from it.

Section 2 of the Harrison Narcotic Act, 26 U.S.C.A. Int.Rev.Code § 2554(g), provides, among other things, that: "It shall be unlawful for any person to obtain by means of said order forms any of the aforesaid drugs for any purpose other than *the use, sale, or distribution thereof by him in the conduct of a lawful business in said drugs or in the legitimate practice of his profession."*

■■ Direct Sales Company was bound to know that Dr. Tate was buying morphine on order forms for unlawful purposes. The catalogs and circulars sent to Dr. Tate every ten days constituted an offer to continue to furnish the morphine knowing it was to be used in the violation of the narcotic law. Each time Dr. Tate accepted an offer contained in the catalog, an agreement was made, and the facts and circumstances were sufficient in my opinion to support the inference that what they did was done pursuant to a mutual understanding and a preconcerted design that the narcotic law was to be violated. Asgill v. United States, 4 Cir., 60 F.2d 776; see, also, Heller v. United States, 4 Cir., 104 F.2d 446.

■ The fact that the sales were in large amounts and at frequent intervals are circumstances to be considered along with all other circumstances, and the Courts have given such facts consideration. In Webb v. United States, 249 U.S. 96, 39 S.Ct. 217, 218, 63 L.Ed. 497, after reciting the facts, the Court said: "In order that these facts may have their true color, it should also be stated that within a period of eleven months Goldbaum purchased from wholesalers, in Memphis, thirty times as much morphine as was bought by the average retail druggist doing a larger general business, and he sold narcotic drugs in 6,500 instances; * * *". In United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 305, 66 L.Ed. 619, the Court said: "It may be admitted that to prescribe a single dose, or even a number of doses may not bring a physician within the penalties of the act; but what is here charged is that the defendant physician by means of prescriptions has enabled one, known by him to be an addict, to obtain from a pharmacist the enormous number of doses contained in 150 grains of heroin, 360 grains of morphine, and 210 grains of cocaine."

In United States v. Curtis, D.C.N.Y., 229 F. 288, 291, the Court said: "A prescription, even if issued by a physician, which on its face calls for an unusually and unreasonably large quantity of the drug, is fraudulent of course, as it bears internal evidence that it is not issued in good faith and that it is not a prescription." And, again in the same case: "It is evident to my mind that the sale, distribution, giving away, or dispensing of large and unusual quantities of these drugs, unaccompanied by explanation as to the necessity therefor, are sales and dispensing of the drug for the very purpose of evading the intentions and provisions of the act and therefore unlawful."

In the case of Friedman v. United States, 6 Cir., 260 F. 388, 392, it was insisted that the quantity purchased by the Thompsons was not relevant to any issue, but the Court said: "Further, these purchases were items of evidence which, when considered in connection with other related matters, tended to show the character of the business carried on by the Thompsons. Naturally an inquiry would arise whether such a quantity was necessary to the conduct of any legitimate drug business." In this case we have the physician increasing his orders from about three thousand half-grain tablets every thirty days to as much as six thousand one-half grain tablets every thirty days, or four hundred standard doses per day and the company selling him this unusually large quantity continuing every ten days to solicit orders for as much as it can sell so long as not more than one thousand tablets are on a single order form. The orders came with such regularity and with such disregard as to the amount of

the drugs, Dr. Tate was obtaining, that it was even shown that on November 13, 1939, the company mailed an order for one thousand half-grains which was delivered on November 17, 1939, and that on November 15, 1939, another order was mailed which was delivered on November 18, 1939.

▮▮ An unlawful agreement need not be shown to exist in any formal way. In fact, it is a rare thing that an unlawful agreement can be so shown. A mutual understanding between the parties or any two or more of them is all that is necessary to prove a conspiracy. United States v. Wilson, D.C.W.Va., 23 F.2d 112; Fisher v. United States, 4 Cir., 13 F.2d 756.

▮ The Direct Sales Company contends that because it does not know Dr. Tate or any of the other defendants it cannot conspire with them. Its dealings were with Dr. Tate over a period of years. It knew he could not lawfully dispense the amount of morphine he was purchasing. The facts were sufficient to justify the jury in concluding that with this knowledge it was combining with others to dispose of the drugs unlawfully. The guilt of a conspirator is not dependent on his knowledge of the entire scope of the conspiracy, and one conspirator need not know who all the other conspirators are. McDonnell v. United States, 1 Cir., 19 F.2d 801, certiorari denied 275 U.S. 551, 48 S.Ct. 114, 72 L.Ed. 421; Jezewski v. United States, 6 Cir., 13 F.2d 599; United States v. Sacia, D.C.N.J., 2 F. 754; Allen v. United States, 7 Cir., 4 F.2d 688.

But, it is contended that the case of United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, compels a different conclusion. In that case the Supreme Court said: "The question presented by this record is whether one who sells materials with knowledge that they are intended for use or will be used in the production of illicit distilled spirits may be convicted as a coconspirator with a distiller who conspired with others to distill the spirits in violation of the revenue laws", and after a discussion of the applicable authorities answered the question in the following language: "Those having no knowledge of the conspiracy are not conspirators, [citing cases]; and one who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowl-

edge. On this record we have no occasion to decide any other question."

The Falcones were jobbers of sugar who sold to wholesalers, who in turn sold to distillers. The decision might have been different had the Falcones sold direct to the distillers as was the case between Direct Sales Company and Dr. Tate. The Falcone case was much stronger against the defendants Alberico and Nole than against the Falcones. (See footnote to decision.) The Court said, "The evidence respecting the volume of sales to any known to be distillers is too vague and inconclusive to support a jury finding that respondents knew of a conspiracy from the size of the purchases even though we were to assume what we do not decide that the knowledge would make them conspirators or aiders or abettors of the conspiracy". In the first place the evidence as to volume of sales in the Falcone case was "vague and inconclusive". In the instant case it is clear and conclusive, not a few isolated large sales but a systematic course of dealings covering a long period of time. In the second place, the sale of sugar and yeast is not the subject of strict legal regulation. Under certain circumstances a report of such sales must be made but no legal formalities must be complied with in making the sales. Such articles of merchandise may be freely sold in any amount to any person at any time and under any circumstances, whereas the sale and distribution of narcotics is strictly regulated by law. In the case of Dr. Tate, when he bought narcotics he could not sell them or give them away. There was only one way under the law by which he might dispose of them and that was by personal administration. The Direct Sales Company selling direct to him without the intervention of a middleman knew he could not possibly dispose of the drugs he was ordering in a lawful manner and with such knowledge it did the *affirmative* things which the Falcones were not charged with doing, that is, it solicited further orders every ten days and did so in a peculiarly clever and attractive way. It suggested to him by letter dated June 30, 1939, that as often as he ordered, his orders would be filled just so long as he did not put more than one thousand half-grains on one order form. It from time to time changed the form of its advertisements of narcotics so as to keep continuously before him attractive prices for *large lots*. It is as though its own salesman every ten days

came around and personally solicited, using the arguments set forth in the advertisements, all the while knowing the impossibility of the drugs being used lawfully and that if they were being used unlawfully other persons were associated with him in such use. Knowing this, it *solicited, encouraged, instigated, induced, counseled* and *aided* Dr. Tate and thereby did the affirmative things which made it a party to an agreement with Dr. Tate and his associates although it may not have known who such associates were.

There have been three decisions of the appellate Courts since the Falcone decision in the Circuit Court which cite and distinguish the case. These will be briefly commented upon.

On March 25, 1940, the Circuit Court of Appeals for the Second Circuit, while its decision in the Falcone case was on appeal to the Supreme Court of the United States, had under consideration a conspiracy case, United States v. Pandolfi, 110 F.2d 736, 737. In that case the Court said of the evidence, "It will be seen that if this evidence proves anything, it demonstrates much more *direct participation* in the conspiracy than was shown in United States v. Falcone, supra. If the jury were to be permitted to make the deductions and inferences from this proof which would be logical and natural under the circumstances, they would necessarily conclude that these defendants took an *active part* in carrying the conspiracy forward, and *did not limit their activities* merely to the legal sale of sugar. We feel there is no reason why the jury should be denied the opportunity to make such logical and natural inferences." (Italics added.)

On June 10, 1940, while the Falcone case was on appeal, the Fourth Circuit Court of Appeals mentioned the case of Backun v. United States, 4 Cir., 112 F.2d 635, 636. In that case Backun in New York bought silverware which he knew had been stolen and sold it to Zucker who was apprehended in Charlotte, North Carolina, in possession of some of it. The facts showed that Backun knew that Zucker traveled and sold goods out of the State of New York. They were indicted as principals under the National Stolen Property Act, 18 U.S.C.A. § 413 et seq. This is not a conspiracy case but facts which show one defendant an aider and abettor will also frequently show him a conspirator had he been charged with conspiring with another. The first question

raised by the appeal was that there was no evidence that Backun had anything to do with the transportation in interstate commerce. The Court said, "On the question raised by the first contention, it is to be noted that the case presented is not that of a mere seller of merchandise, who knows that the buyer intends to put it to an unlawful use, but who cannot be said in anywise to *will the unlawful use by the buyer*. Cf. United States v. Falcone, 2 Cir., 109 F.2d 579. It is the case of a sale of stolen property by a guilty possessor who knows that the buyer will transport it in interstate commerce in violation of law and who *desires to sell it to him for that reason*." (Italics added.) And in the same case, the Court said, "Guilt as an accessory depends, not on 'having a stake' in the outcome of crime, as suggested in the Falcone case, supra, but on aiding and assisting the perpetrators; and those who make a profit by furnishing to criminals, whether by sale or otherwise, the means to carry on their nefarious undertakings aid them just as truly as if they were actual partners with them, having a stake in the fruits of their enterprise. To say that the sale of goods is a normally lawful transaction is beside the point. *The seller may not ignore the purpose for which the purchase is made if he is advised of that purpose,* or wash his hands of the aid that he has given the perpetrator of a felony by the plea that he has merely made a sale of merchandise." (Italics added.)

On June 24, 1941, the Third Circuit had occasion to consider the Falcone case in United States v. Harrison, 121 F.2d 930, 932. The appellant was "a dealer in sugar in New York City, was convicted of conspiracy to defraud the revenue through the operation of an unregistered * * * still." The Court said, "The principal ground of his appeal is a claim for the benefit of a recent decision of the United States Supreme Court. He contends that it compels a direction in his favor." After quoting the last paragraph of the opinion in the Falcone case, the Court says, "This is at most a declaration that the Supreme Court sides with the numerical minority on a question much agitated in the United States Courts during the prohibition era. That question is the legal position vis a vis a conspiracy of a seller who knows that the goods he supplies are destined for an illegal use; or in other words, of a 'wise' owner of innocent goods which contribute

to the operation of an illegal distillery. We can start with the *assumption that an intention to become a party to an illegal enterprise must be predicated on some affirmative action.* That is the consensus of both the minority and majority views. *The sale of goods surely constitutes affirmative action.* The problem has arisen in the civil as distinguished from the criminal law. There we find the earlier cases holding that no principle of law compels a seller to take cognizance of the morals of his customers. Later the civil judges displayed a tendency opposite to that of their brethren on the criminal side. They stiffened the rule and made participation turn upon the magnitude of the buyer's wrongful purpose and so upon the nature of the crime. It may be that the same compromise will ultimately be the rule of the Supreme Court." . (Italics added.) In this case there was ample evidence of "further participation" and so the judgment of the District Court was affirmed. The evidence of "affirmative action" and "further participation" on the part of Direct Sales Company has already been pointed out.

The rule laid down by the Supreme Court in the Falcone case has always been the rule in the Fourth Circuit. Simpson v. United States, 4 Cir., 11 F.2d 591; Fisher v. United States, 4 Cir., 13 F.2d 756; Di Bonaventura v. United States, 4 Cir., 15 F. 2d 494, 495. In the latter case Judge Parker wrote the opinion which simply holds that a landlord is not necessarily guilty of a conspiracy to violate the Prohibition Act, 27 U.S.C.A. § 1 et seq., merely because he has knowledge that liquor is being manufactured on his premises and does not stop it. In commenting on the trial Court's charge, Judge Parker said, "The learned trial judge evidently had in mind the rule that one who, with knowledge of the existence of a conspiracy, aids in carrying out its design is guilty with the other conspirators; but the trouble is that the portions of the charge complained of authorized a conviction, not upon a finding that a conspiracy existed, and that the landlord, with knowledge of its existence, aided the conspirators in carrying out its purpose, but upon a finding of no more than that liquor was being manufactured on his premises, and that he knew what was going on and did not stop it."

It is evident that the indictment in the Falcone case charged a conspiracy to commit a single offense. The indictment in this case charges a conspiracy to commit several offenses among which is that they conspired to violate that portion of Section 2 of the Act which provides that "It shall be unlawful for any person to obtain by means of said order forms any of the aforesaid drugs for any purpose other than the use, sale, or distribution thereof by him in the conduct of a lawful business in said drugs or in the legitimate practice of his profession." The trial of this case in reality finally resolved itself into the question of whether or not Direct Sales Company and Dr. Tate agreed to violate this provision. The fact that they did violate the section would not prevent their conviction for having conspired to do so as has already been pointed out. Let it be assumed that the other defendants could have successfully maintained that they did not know of this conspiracy between Dr. Tate and the Direct Sales Company. They did not raise the point but plead guilty generally to the indictment. A conviction for having conspired to commit any one of the offenses charged would be good if supported by the evidence. The jury would have been justified in finding that Dr. Tate and Direct Sales Company agreed to violate the quoted portion of Section 2 and that the other defendants knew of such conspiracy and joined it for the defendant Johnson testified that one of the purchases he made from Dr. Tate was in a bottle of the Direct Sales Company. Likewise the jury would have been justified in finding Dr. Tate and Direct Sales Company guilty of an agreement to violate the above-quoted portion of Section 2 of the Act and not been concerned at all about the defendants who plead guilty, whether they knew of the conspiracy or not.

For the foregoing reasons the motion for new trial and the motion for arrest of judgment should be denied.