## DAHLY v. UNITED STATES.
### BEATON v. SAME.
#### Nos. 9045, 9060.

Circuit Court of Appeals, Eighth Circuit.
May 2, 1931.

Theodore Hollister, of Duluth, Minn. (Jay H. Hoag, of Duluth, Minn., on the brief), for appellant Dahly.

Arthur LeSueur, of Minneapolis, Minn., for appellant Beaton.

George A. Heisey, Asst. U. S. Atty., of St. Paul, Minn. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., on the brief), for the United States.

Before VAN VALKENBURGH and BOOTH, Circuit Judges, and MUNGER, District Judge.

BOOTH, Circuit Judge.

There are here two appeals from judgments of conviction under the Conspiracy Statute (section 37, Cr. Code [18 USCA § 88]).

The indictment (filed September 13, 1929) alleged that the conspiracy was between three officers of the United States and a fourth person. The three officers were Dahly, collector of customs at Duluth; Beaton, a customs supervising agent located at St. Paul, but whose duties took him elsewhere; Hoban, a customs inspector in the Duluth district. The fourth person was Peters, a resident of Duluth. The offense to be committed against the United States was charged to be that set out in title 18, USCA, § 203, which reads as follows:

"(Criminal Code, section 113.) *Receiving pay by Member of Congress in matters affecting United States.* Whoever, being elected or appointed a Senator, Member of or Delegate to Congress, or a Resident Commissioner, shall, after his election or appointment and either before or after he has qualified, and during his continuance in office, or being the head of a department, or other officer or clerk in the employ of the United States, shall, directly or indirectly, receive, or agree to receive, any compensation whatever for any services rendered or to be rendered to any person, either by himself or another, in relation to any proceeding, contract, claim, controversy, charge, accusation, arrest, or other matter or thing in which the United States is a party or directly or indirectly interested, before any department, court-martial, bureau, officer, or any civil, military, or naval commission whatever, shall be fined not more than $10,000 and imprisoned not more than two years; and shall moreover, thereafter be incapable of holding any office of honor, trust, or profit under the Government of the United States. (R. S. § 1782; Mar. 4, 1909, c. 321, § 113, 35 Stat. 1109.)"

The charging part of the indictment and the overt acts alleged are set out in the margin.[1]

[1] "And the grand jurors aforesaid, upon their oath aforesaid, do further present, that one Edward A.

It is seen from the allegations of the indictment that the charge in brief was that the conspirators agreed to receive from Smith compensation for services to be rendered by them to him in connection with the charge against him; that the services were to consist in endeavoring to induce Drill (United States Attorney) (a) to dismiss the charge against Smith; or (b) to recommend a fine as punishment; or (c) to recommend a com-

Smith, during said period of time, to-wit, on December 5, 1928, was charged and accused, in a complaint made on behalf of the United States before one Lloyd J. Palmer, then and since then a United States Commissioner for said District of Minnesota, with a criminal offense against the United States in his having before then violated the narcotic laws of the United States in said District of Minnesota, and that throughout said period of time said charge, accusation and complaint, and the prosecution thereof, stood pending before one Lewis L. Drill, then the United States Attorney for said District of Minnesota and an officer of the United States and of the Department of Justice in the Government thereof.

"And the grand jurors aforesaid, upon their oath aforesaid, do further present, that said Oscar E. Dahly, Ernest W. Beaton and Thomas F. Hoban, throughout said period of time at Duluth aforesaid, in the Fifth Division of said District of Minnesota, each as aforesaid then and there so being an officer in the employ of the United States, unlawfully and feloniously did conspire, combine, confederate and agree together, with Edward Peters, and with divers other persons to said grand jurors unknown, to commit divers, to-wit, three, offenses against the United States, to be committed by said Oscar E. Dahly, Ernest W. Beaton and Thomas F. Hoban, and each to consist in their together receiving, from said Edward A. Smith, compensation, to-wit, a sum of money, at one time one thousand dollars, at another time thirty-five hundred dollars, and at another time sixty-five hundred dollars, for certain services to be rendered by them to him the said Edward A. Smith while they were still such officers in the employ of the United States, in relation to said charge, accusation and complaint against him the said Edward A. Smith, the same being throughout said period of time, as said conspirators then well knew, a matter and thing in which the United States was a party; and that said services, according to said unlawful and felonious conspiracy, combination, confederation and agreement, were to consist in said Oscar E. Dahly, Ernest W. Beaton and Thomas F. Hoban, by their influence as such officers, by persuasion, and by their enlisting the influence of Thomas D. Schall, then a United States Senator for the State of Minnesota, in favor of it, endeavoring to induce said Lewis L. Drill, United States Attorney and officer as aforesaid, either to dismiss said charge, accusation and complaint before said United States Commissioner, and discontinue any further proceedings by him in the matter of such charge and accusation, or to recommend to the court fixing the punishment in said matter a sentence not involving imprisonment, or to recommend the acceptance by the Secretary of the Treasury of the United States of an offer of said Edward A. Smith to pay money in compromise of his the said Edward A. Smith's civil and criminal liability in said matter, as said Lewis L. Drill should prefer; said Oscar E. Dahly, Ernest W. Beaton, Thomas F. Hoban and Edward Peters being herein referred to as conspirators.

### "Overt Acts.

"And the grand jurors aforesaid, upon their oath aforesaid, do further present, that said conspirators, at the several times during said period of time, and at the several places, in that behalf hereinafter mentioned in connection with their names, did do, among many other acts done by them for that purpose, certain acts to effect the object of said unlawful and felonious conspiracy, combination, confederation and agreement; that is to say:

"1. Said Ernest W. Beaton, on December 8, 1928, at Duluth aforesaid, in said Fifth Division of said District of Minnesota, invited said Edward A. Smith

to meet him the said Ernest W. Beaton at Hotel Duluth.

"2. Said Ernest W. Beaton, on said December 8, 1928, at Duluth, aforesaid, in said Fifth Division of said District of Minnesota, introduced said Edward A. Smith to said Oscar E. Dahly.

"3. Said Oscar E. Dahly, on December 15, 1928, at Duluth aforesaid, in said Fifth Division of said District of Minnesota, introduced to said Edward A. Smith said Thomas F. Hoban under the name of Timmons.

"4. Said Thomas F. Hoban, on said December 15, 1928, at Duluth aforesaid, in said Fifth Division of said District of Minnesota, requested said Edward A. Smith to pay to him the said Thomas F. Hoban the sum of one thousand dollars in money.

"5. Said Thomas F. Hoban, on said December 15, 1928, at Duluth aforesaid, in said Fifth Division of said District of Minnesota, accepted and received from said Edward A. Smith the sum of one thousand dollars in money.

"6. Said Thomas F. Hoban, on said December 15, 1928, departed from Duluth aforesaid, in said Fifth Division of said District of Minnesota, for the City of Washington, in the District of Columbia.

"7. Said Thomas F. Hoban, on December 17, 1928, departed from said City of Washington for Duluth aforesaid, in said Fifth Division of said District of Minnesota, arriving at said Duluth on December 19, 1928.

"8. Said Thomas F. Hoban, on December 17, 1928, sent a telegram from Washington aforesaid to said Oscar E. Dahly at Duluth aforesaid, containing the following words, to-wit: Everything O. K. Tim.

"9. Said Edward Peters, on December 19, 1928, at Duluth aforesaid, in said Fifth Division of said District of Minnesota, discussed with said Oscar E. Dahly and said Thomas F. Hoban ways and means of effecting the object of said unlawful and felonious conspiracy, combination, confederation and agreement.

"10. Said Thomas F. Hoban, on December 19, 1928, at Duluth aforesaid, in said Fifth Division of said District of Minnesota, requested said Edward A. Smith to pay him the said Thomas F. Hoban the further sum of ten thousand dollars in money, thirty-five hundred dollars of which was to be paid on or before December 21, 1928.

"11. Said Oscar E. Dahly, on December 30, 1928, at Los Angeles, in the State of California, wrote and mailed to said Thomas F. Hoban a certain letter, to-wit, a letter of the tenor following:

"The Langham

"Apartment Hotel

"7th at Normandie

"Los Angeles.

"12/30/28

"Dear Tim—Just a line or two to let you know we are still walking around. The Mrs. is feeling a lot better. I am taking the Drs. dope and plenty of H 2 0—but I still need your 'Hert' you spoke of.

"Am anxious to know how ever little thing is—your East End friend and your West End bozo.

"Drop a line to L. R. Smith, 702 Mariposa South, Apt. 102 that is my sister in law—

"Do not let anyone around the north know who this is. If you mail any packages, send to same Address. Phone is Drexel 4483.

"Things are booming out here again. Have a party waiting for me so must cut this short. Best from us both—

"Yours—                    900.

"12. Said Thomas F. Hoban, on January 5, 1929, at Duluth aforesaid, in said Fifth Division of said

promise of the charge through the Treasury Department of the United States; that the endeavoring was to be (1) by the influence of the conspirators; (2) by persuasion; (3) by enlisting the influence of a named United States Senator.

The case was tried; each of the defendants made motion for directed verdict at the close of all the evidence; the motions were denied; and the three officials were convicted. Hoban had also previously pleaded guilty to the charge of having committed the substantive offense under section 203. Peters was found not guilty. The present appeals followed as to Dahly and Beaton.

The vital question on these appeals is whether the court should have directed verdicts in favor of Dahly and Beaton.

The salient facts are substantially as follows: December 6, 1928, Smith was arrested for illegal sale of narcotics. He was taken before a United States Commissioner on that date; a hearing was had; a bond was given; and he was released. Smith immediately began efforts to get into touch with Beaton. He telephoned to Beaton's mother-in-law and found that Beaton was at Two Harbors on official business. After several efforts, he reached him by telephone and made an appointment with him for the 8th of December, when Beaton said he would return to Duluth. Smith had known Beaton for a number of years. Smith's family and Beaton's father-in-law and mother-in-law were neighbors and friends. Beaton returned to Duluth on the night of December 8th, and Smith and his son, Dr. Wallace Smith, had an interview with him at the Hotel Duluth. Dahly and a man by the name of Christiansen were in Beaton's room and he introduced them to Smith. They, however, shortly left. Smith then told Beaton about the narcotic charge against himself and asked Beaton to put in a good word for him. Beaton told Smith that the offense was a very serious one, and that he doubted whether he could do anything for him. Both Smiths testified that they knew that the offense was serious before being so told by Beaton. Edward Smith testified: "I knew before I was arrested that some people had received as high as ten to fifteen years for violation of the narcotic act in this district. I knew that before I went to see Beaton."

At the interview with Beaton, both of the Smiths were very much excited. The son testified:

"I was so worried over the offense and so worried over Dad's condition that we didn't know what we were doing. * * *

"Father was talking that night somewhat at random about this matter; couldn't get his mind down to one point as to just how it happened; he was too excited."

The sale of Smith's drug store was also talked about. Smith had been trying to sell his drug store for sometime on account of bad health. He told Beaton that he thought it might help his case if he should sell out his drug store, and that he wanted to find somebody that would buy it. Finally Beaton promised Smith that he would see Mr. de la Gardia, narcotic agent in Minneapolis, when he returned from Duluth.

There is little difference between the account of the Smiths and the account of Beaton as to what occurred at this interview, except that the Smiths testified that Beaton told them about the case of a man who was charged with violating the Prohibition Act and got off with a fine, but had to pay his attorney $2,000. Beaton denied telling this story. The Smiths also testified that Beaton said that, if Smith got a tip, to do something or to hire somebody to go ahead and do it; and that Beaton said further that he couldn't telephone or write to him.

During the period from December 8th to 13th, Beaton was engaged in carrying on the investigation mentioned, at Two Harbors. It involved the stealing of certain ale. Dahly and Hoban were interested in the investigation, and the three men drove back and forth between Duluth and Two Harbors together in an automobile. The Smith matter was discussed, and the possible sale of the Smith Drug Store. Beaton told Dahly what Smith had told him. During this period, Peters, one of the defendants, had learned from Olson and Dahl of the Northern Drug Company that possibly the Smith Drug Store might be for sale. Peters had been looking for the opportunity to buy a drug store. He had formerly worked for Dahly in a drug store owned by him. Peters talked to Dahly as early as December 9th about the possible purchase of the Smith Drug Store. Dahly

District of Minnesota, received from said Edward A. Smith the sum of Thirty-five Hundred dollars in money.

"And so the grand jurors aforesaid, upon their oaths aforesaid, do say, that said conspirators, at the time and place, and in manner and form, afore-said, unlawfully and feloniously did conspire to commit offenses against the United States, and did do acts to effect the object of the conspiracy: Against the peace and dignity of the United States, and contrary to the form of the statute of the same in such case made and provided."

told Beaton that Peters might possibly buy the store.

On December 15th, in a telephone talk between Dahly and Beaton about the ale investigation, the Smith matter was mentioned, and either Dahly or Beaton suggested that Smith see Dahly. Beaton called Smith by phone the same morning and Smith went to Beaton's room. Smith testified as to what occurred:

"The first thing Mr. Beaton did on the 15th he called me up from the hotel. Told me over the phone to come to the hotel Duluth. I went there; Beaton was there.

"Q. What did he tell you when you saw him? A. He said to go and see Mr. Dahly, that he was reliable, and I could depend on anything he said. Then I left Beaton's room and went up to see Mr. Dahly in his room."

The testimony as to what occurred in Dahly's room is as to some matters undisputed; as to other matters, in sharp dispute. Smith testified as follows:

"Q. * * * What conversation did you have with Mr. Dahly on this date, after Mr. Beaton sent you to his room? A. He said that I should get up a petition and get it signed by my friends. A character petition.

"Q. What else did he say to you? A. Well, he said he would send a man—one of his men to Washington that had a lot of influence and that I should talk to him.

"Q. Did he tell you why; did he say anything further about the man going to Washington for the purpose of a visit or anything? A. Yes, he was going to see the senator—to see the district attorney—I, — I have forgot.

"Q. Just tell it as near as you remember? A. All I remember he told me to see his man, his head man.

"Q. Well, how did you get in touch with the man that Mr. Dahly was speaking about? A. He went out and got him. And brought him back into the room.

"A. Who did he bring back into the room? A. Timmins. [Hoban]

"Q. Mr. Dahly introduced you? A. Yes, he said he would take care of me. He said he was influential in Washington, and that he would take care of me.

"Q. Who said that? A. Dahly said that.

"Q. Mr. Dahly said Mr. Timmins would take care of you? A. Yes.

"Q. What else was said—did Mr. Dahly remain in the room? A. No, he went out."

Smith also testified that no one else was present in Dahly's room until Dahly went out and brought in Hoban (Timmins). Smith also testified that the petition advised by Dahly was a character petition, but was not to contain an admission of guilt. Smith also testified that he got up the petition and took it to the Northern Drug Company, but it was not used. Smith testified further that nothing was said while Dahly was present about money or paying any one. Smith testified further that he could not remember whether he and Dahly discussed the sale of the drug store. Dahly testified that Smith came to his room on the morning of the 15th and appeared to be very much excited; that they talked about the sale of the drug store and the possibility of Peters buying it; that they then talked of the charge against Smith; that he (Dahly) advised Smith to get up a character petition admitting his guilt and present it to the court, and ask for leniency.

Dahly testified that he made no statements about sending a man to Washington and did not go out and get Hoban and introduce him to Smith. Dahly further testified that two other men, Zoey and Cook, were in his room during all the time that Smith was there. Zoey and Cook corroborated the testimony of Dahly. The testimony of Dahly was also corroborated, as to the contents of the petition to be gotten up, by the testimony of Olson of the Northern Drug Company, whom Smith consulted as to circulating the petition.

The testimony of Smith as to what occurred at the interview which he claims took place between himself and Hoban on December 15th is to the effect that Hoban asked him what the charges were against him and said he would have to go to Washington "to bring a Senator who appointed the district attorney at St. Paul, and he would see him"; that Hoban also said he would have to have $1,000 for expenses; and that he and Hoban went to the bank and he got the money and gave it to Hoban.

Smith testified further that on December 19th Hoban called him to the hotel and Smith went and met him. Hoban then told him that he had been to Washington and had things started, and further told Smith that he must have $3,500 more; that the whole matter would cost $10,000; that the men they were dealing with were highpriced men. Smith told Hoban that $3,500 was "pretty much." Hoban also asked Smith

about selling his drug store and said he knew a man who wanted to buy a drug store. Smith said he would have to sell the drug store. Hoban then called Peters by phone and shortly thereafter Peters came up to Hoban's room. After some talk, Smith and Peters went to look over the drug store.

Smith, on his cross-examination, was uncertain whether Hoban called Peters into conference as to the sale of the store on December 15th or on the 19th, when the second interview was had.

Peters testified that it was on the 14th when he was called by Hoban to meet Smith, and that he and Smith went to the store and looked it over on that date.

Later in the day, on the 19th, Smith telephoned his brother, Elmer Smith, and Elmer came from Minneapolis to Duluth. Smith told him his whole story, and Elmer took Smith back to Minneapolis, and they went before officers of the Department of Justice, and there Smith told all about the charge against him, and all about the negotiations with Hoban.

On December 15th, Beaton returned to his office in St. Paul. On the 18th, he telephoned to de la Gardia, the narcotic agent at Minneapolis, as he had promised Smith. Mr. de la Gardia was not in but Beaton talked to Mr. Wall, an assistant. Beaton asked if the case of Smith was one that could properly be compromised. Wall said he would look up the files. Later Beaton received, through his secretary, Wall's message that the case was not one that would be compromised, but that criminal proceedings had already been commenced; that the file on Smith was bad. Upon receiving the message, Beaton said, "To hell with them," or "to hell with him."

On December 21st, Dahly left for California on official business. He stopped at St. Paul. While there, on December 22d, he saw Beaton and Hoban, but he testifies that he had no talk with them relative to the Smith matter. The same day Beaton and Hoban had lunch together, but Beaton testified that they did not discuss the Smith matter.

On January 5, 1929, Hoban, in Duluth, telephoned to Smith to come to the hotel, and Smith did so, accompanied by his brother Elmer. They had prepared $3,500 in bills marked, which Smith carried. Two policemen followed them at a distance. Smith went alone to Hoban's room and gave him $3,500. Hoban asked Smith to meet him again at 2 o'clock in the afternoon, as his man was in town. Smith left, and immediately the policemen went in and arrested Hoban and found the money, which had been marked. Other facts will appear in the discussion.

The present indictment followed.

Before considering the evidence, it may not be amiss to restate a few of the well-established principles of law applicable to the present case. Citation of authorities will not be necessary.

■ A conspiracy under section 37 Cr. Code (18 USCA § 88) is an agreement by two or more persons to commit an offense against the United States. The gist of the offense is the conspiracy; that is, the agreement between two or more persons to effect the unlawful end; but before the offense is a completed one, some one or more of the parties to the conspiracy must do some act to effect the object of the conspiracy. Such act is called an overt act.

Two things, therefore, must be proved before a conviction can properly be had: (1) The conspiracy or agreement to commit the offense named against the United States; (2) an overt act or acts done in furtherance of the conspiracy. The overt act or acts need not be criminal per se; but an overt act must be one independent of the conspiracy or agreement. It must not be one of a series of acts constituting the agreement or conspiring together, but it must be a subsequent independent act following the complete agreement or conspiracy, and done to carry into effect the object of the conspiracy.

■ The overt act or acts, the manner and circumstances under which they are done, may be considered in connection with other evidence in the case as circumstances in determining whether or not there was formed the conspiracy or agreement charged; but it must be established that the conspiracy or agreement which is charged to have existed and which is the gist of the offense had been formed before and was existing at the time of the commission of the overt act or acts.

Proof of the overt acts may or may not be sufficient to prove the conspiracy. This will depend upon the character of the overt acts; not whether they are criminal per se or not, but whether they are of such character separately or collectively that they are clearly referable to a preagreement or conspiracy of the actors. If the jury is satisfied, beyond a reasonable doubt, from the evidence

that such is the character of the overt acts proven, the jury may find the preexistence of the conspiracy. Otherwise, evidence independent of the overt acts is necessary to prove the conspiracy.

Circumstantial evidence is equally available with direct evidence to prove the conspiracy, but suspicion or conjecture cannot take the place of evidence. Guilt must be established beyond a reasonable doubt, and, where the evidence is as consistent with innocence as with guilt, no conviction can properly be had. Even participation in the offense which is the object of the conspiracy does not necessarily prove the participant guilty of conspiracy. The evidence must convince that the defendant did something other than participate in the offense which is the object of the conspiracy. There must, in addition thereto, be proof of the unlawful agreement and participation therein, with knowledge of the agreement.

Presumption cannot be based upon another presumption, but only upon facts. It is not necessary that all of the alleged conspirators should have been such from the beginning of the conspiracy. There may be a subsequent joining; but a person, to be held as subsequently joining a conspiracy, must be shown to have had knowledge of the conspiracy at the time of joining, and to have participated while having such knowledge.

In the case at bar, it is conceded by counsel for the government that the conspiracy claimed was not formed until after the interview between Smith and Beaton on the night of December 8, 1928; therefore, what was said and done by Beaton at that interview cannot be considered as overt acts. It follows that the acts alleged as overt acts 1 and 2 cannot be considered as such; nor can they be considered as evidence of a preexisting conspiracy; nor can they be considered as evidence in any respect against Dahly.

Even conceding that the statements as to acting on a tip, testified to by Smith, were made by Beaton, and placing the worst permissible construction upon them, they would merely support a suspicion that Beaton had in mind that Smith should avail himself of aid of doubtful legitimacy if opportunity offered. But such an inference is not a necessary or even a natural one. This is shown conclusively by the fact that neither of the Smiths drew any such inference. Wallace Smith testified on this point as follows:

"Q. You spoke of him saying he might get some tip as to how the matter should be handled? A. Yes, sir.

"Q. Was there anything said by Mr. Beaton which would indicate that any suggestion he would make would be anything unlawful or improper? A. No, sir.

"Q. And the tip— A. Yes.

"[A.]—Whatever it might be you looked on as in the nature of some suggestion which he might offer that might be of some benefit to your father in his case? A. Well, we didn't know, we left that up to him.

"Q. Well, was that not your understanding? A. Yes.

"Q. And you felt that anything he would have to offer in the way of a suggestion would be perfectly legal and proper and nothing wrong about it? A. Yes.

"Q. And you don't mean to tell us here in relating any such conversation that Mr. Beaton agreed to do anything that was not right? A. Well, we left that up to him entirely.

"Q. Your request and your conversation were in no way intended that any public official should be bribed, or anything of that kind? A. No, sir, perfectly legal.

"Q. And you wouldn't expect and didn't expect Mr. Beaton to do anything except what was perfectly proper to render— A. Perfectly proper.

"Q. —Some assistance to your father?
* * *"

Furthermore, it is to be noted that nothing was said in the talk with Beaton about the payment of any money. Smith testified: "There was no talk there that night between myself, Beaton and my son as to my paying Mr. Beaton anything for his services for doing anything for me to help me. We didn't offer to pay him; he didn't ask for anything. He simply told me that he would see de la Gardia and find out his attitude about my case and let me know; he said, next week. That is all I asked him to do."

Wallace Smith testified: "There was no talk there that night with Mr. Beaton about any money. We didn't offer him any money; he didn't ask for any money. There was no intention on my part of doing anything wrong, or having Mr. Beaton do anything wrong."

Suggestion is made by government counsel that Beaton sought to terrorize Smith by dwelling upon the seriousness of the offense that he had committed. The suggestion is wholly without merit. Smith knew of the

seriousness of his offense before he saw Beaton, and he so testified. Furthermore, the offenses which Smith had committed and confessed to Beaton were serious. They involved, not only sales of narcotics contrary to law, but falsification of records made to the United States government.

The testimony of Smith that Beaton said he could not telephone or write him is discredited by the uncontradicted fact that Beaton did telephone to him within a week.

It is further contended that two other matters with which Beaton was connected tend to prove the alleged conspiracy, and Beaton's connection with it. They are the sending of Smith by Beaton to see Dahly on December 15th; and the meeting of Beaton with Dahly and Hoban in St. Paul on December 22d. Both matters are without probative force of guilt when viewed in the light of their surrounding circumstances. As to the former, Smith had told Beaton that he wished to sell his drug store. Dahly had told Beaton that Peters, a former employee of Dahly, might buy the store. What was more natural than that Beaton should send Smith to see Dahly. The act was perfectly innocent in itself and requires the piling of presumption upon presumption to connect it with the conspiracy charged. The meeting of Dahly, Beaton, and Hoban in St. Paul on December 22d is also devoid of sinister aspect, when viewed in the light of the surrounding circumstances. Beaton's office and headquarters were in St. Paul. Dahly was on his way to California on a government mission. What Hoban's exact business in St. Paul was is not shown, except that he visited the District Attorney's office on that day and requested that the Smith matter be considered carefully.

There is no evidence that either Dahly or Beaton knew of the visit of Hoban to the District Attorney's office; no evidence whatever that either Dahly or Beaton knew that Hoban had received money from Smith or that he was interesting himself in Smith's behalf.

The three men, Dahly, Beaton, and Hoban, were government officials. They had recently been associated in a government investigation at Two Harbors. There was nothing unusual or suspicious that they should call upon each other if they were in the same city. Here, again, it requires the piling of presumption upon presumption to connect the St. Paul meeting with the conspiracy charged.

Our conclusion is that the evidence by which it is sought to connect Beaton with the conspiracy charged, even if a conspiracy existed, cannot be considered as substantial; at most, it amounts to a very slender suspicion.

The evidence as to the case against Dahly —whether the conspiracy charged existed and whether he was a party thereto—is also entirely circumstantial.

The matters mainly relied upon by the government are: The alleged introduction by Dahly of Smith to Hoban, and the statements of Dahly in connection therewith; the trip to Washington by Hoban and the telegram sent by him to Dahly; the meeting of Dahly, Beaton, and Hoban at St. Paul; the trip by Dahly to California and the use by him of an assumed name in connection therewith; the letter written by Dahly from California to Hoban.

As to the alleged introduction by Dahly of Smith to Hoban and the attendant statements by Dahly, it is clear that, unless these things did occur, the remaining evidence presents no semblance of a case either against Dahly or Beaton; but, on the other hand, it must be conceded that, if full credence is to be given to the testimony of Smith, these matters at least form suspicious circumstances. Whether such credence should be given to the testimony of Smith may be open to grave doubt. The mental condition of Smith was shown by the evidence to be open to serious question. In addition to this, his testimony as to this particular matter was denied by Dahly and by two distinterested witnesses, Zoey and Cook; further, Smith's testimony as to other matters was confusing and contradictory; still further, he admitted having violated the Harrison Anti-Narcotic Act; and, finally, his veracity as a witness was completely destroyed by his own testimony and by the admission of government counsel.

Without trenching upon the general rule that appellate courts will not usually weigh the evidence, yet on account of the foregoing considerations, and in view of the exceptional facts in the case, we are of the opinion that the testimony of Smith relative to the particular matters mentioned cannot be held to be substantial in any true sense of that word. 17 C. J. §§ 3594–3596; Sykes v. United States, 204 F. 909 (C. C. A. 8); United States v. Murphy (D. C.) 253 F. 404; Jahnke v. State, 68 Neb. 154, 94 N. W. 158, 104 N. W. 154; Green v. State, 6 Okl. Cr. 585,

120 P. 667; Standford v. State, 16 Okl. Cr. 107, 180 P. 712; see, also, Mickle v. United States, 157 F. 229 (C. C. A. 8); State v. Moe, 68 Mont. 552, 219 P. 830; State v. Wilson, 76 Mont. 384, 247 P. 158; Cooper v. State, 130 Miss. 288, 94 So. 161.

But even giving full credence to his testimony, yet the suspicious circumstances thus raised fall far short of being substantial evidence of the conspiracy charged and of Dahly's connection therewith.

Stress is laid on the testimony of Smith that Hoban was introduced under the name of Timmins, and that he knew him under that name thereafter, as indicating an intention of concealing Hoban's identity. The suggestion loses some of its force when it is recalled that Peters was in conference with Dahly and Hoban on December 14th, 15th, or 19th, and that no mention is made in the testimony as to the alleged alias being used at that time. The suggestion loses more of its force when it is recalled that the uncontradicted testimony shows that Hoban was commonly called "Tim" or "Timmy" by his friends. That Smith came to know Hoban as Timmins is, therefore, of no significance, whether Hoban was introduced by Dahly or by Peters.

As to the trip to Washington made by Hoban, there is no direct evidence that this was made at the direction of Dahly, or that Dahly knew of it at the time. The telegram sent by Hoban from Washington to Dahly was never received by the latter, according to his testimony, which in that regard is uncontradicted. Further, in connection with this Washington trip, it is to be borne in mind that the uncontradicted evidence shows that prior to this time Hoban had expressed an intention of going to Washington in connection with the matter of the ale investigation. It seems quite as probable, therefore, that Hoban made the trip for his own purpose and conceived the idea of making Smith pay him money under the belief that the trip was in his behalf, as that Dahly and Hoban had previously conspired to receive money from Smith as compensation for rendering him service in the matter of the charge against him. The telegram which Hoban sent from Washington may quite as probably refer to the ale investigation as to the Smith matters.

The circumstance of the meeting of Dahly, Beaton, and Hoban in St. Paul on December 22d has been already considered as without significance.

The trip by Dahly to California is shown by uncontradicted and disinterested evidence to have been on a governmental mission of a secret nature. The evidence also shows that Dahly, for this reason, did not want it known at Duluth and vicinity that he had gone to California and that he, therefore, had his mail sent by Hoban in the name of L. R. Smith to the address of his sister-in-law. The evidence further shows that this use of the name Smith by Dahly was not uncommon in connection with his work.

Finally, there is a letter sent by Dahly, while in California, to Hoban. With great ingenuity, counsel for the government have sought to connect the words and references contained in the letter with the alleged conspiracy and Dahly's alleged connection therewith. Even the innocent symbol, H 2 O, has had suspicion cast upon it as cloaking something sinister. But the explanations given by Dahly and other witnesses as to the words and references contained in the letter demonstrate conclusively that the letter had no possible connection with the alleged conspiracy.

There are two other circumstances in connection with Dahly's stay in California that are worthy of mention. On January 10, 1929, Dahly, on hearing of the arrest of Hoban, sent the following telegram:

"Los Angeles, Calif. 10
"1929 Jan. 10 P. M. 8 54
"N. A. Linderberg, Asst. Coll. Customs Duluth, Minn.

"Wire me at once Collector Los Angeles present status Hoban matter stop Also write me complete details stop If you have not already done so suspend Hoban pending complete investigation and if as result thereof facts warrant charges should be preferred against him looking to his dismissal.
"Oscar E. Dahly."

And on January 11, 1929, the following:

"1929 Jan. 11 A. M. 12 18
* * * * * * * * * * * *
"Los Angeles, Cal. 10
"Collector of Customs, Treasury Department, Washington, D. C.

"Duluth newspaper accounts refer to arrest patrol inspector Hoban for alleged extortion Stop Request Customs agent Beaton St. Paul be directed to make immediate investigation to determine facts in order that criminal prosecution may be aided if charges are true or that Hoban's dismissal may be

**46**

had if facts warrant preference of charges Stop Advise care collector Los Angeles.

. "Oscar E. Dahly, Collector of Customs."

It is contended by the government that these were self-serving telegrams of a conspirator. . That is a possible explanation. But to us it seems more probable that they were the acts of an officer doing his plain duty, and not at all in line with what might be expected of a conspirator.

Whatever may be thought of the acts of Hoban, the case against the two appellants on the charge of conspiracy appears to us to consist almost entirely of conjecture, suspicion, presumption, and misinterpretation of acts and statements of the two appellants.

The evidence shows that, up to the time of this charge against them, Beaton and Dahly had both borne excellent reputations in the community where they lived.

Our conclusion is that there was no substantial evidence of the formation or existence of the conspiracy charged in the indictment, and that the trial court erred in not granting the motions of appellants for directed verdicts.

The judgment on each appeal is reversed, and the case remanded for a new trial.