**BOOTH v. UNITED STATES, and six other cases.**

**Nos. 453–459.**

Circuit Court of Appeals, Tenth Circuit.

March 23, 1932.

LEWIS, Circuit Judge, dissenting.

J. B. Dudley, of Oklahoma City, Okl. (D. L. Clement, of Tecumseh, Okl., James H. Mathers, of Oklahoma City, Okl., and W. L. Chapman, of Shawnee, Okl., on the brief), for appellants.

William Earl Wiles and D. E. Hodges, both of Oklahoma City, Okl. (Herbert K. Hyde, of Oklahoma City, Okl., on the brief), for the United States.

Before LEWIS and COTTERAL, Circuit Judges, and KENNAMER, District Judge.

KENNAMER, District Judge.

Appellants and several other defendants were convicted upon an indictment charging a conspiracy to violate the National Prohibition Act. The indictment charged, and the proof presented on the trial of the case under the indictment established, that a conspiracy was formed on or about the 1st day of October, 1926, in Pottawatomie county, Okl., and continued without interruption until September 20, 1929. The purposes of the conspiracy so entered into and understood were the unlawful trafficking in intoxicating liquor in Pottawatomie county, Okl. Twenty-six overt acts were charged to have been committed involving the unlawful sale, transportation, and manufacture of intoxicants. A number of the defendants charged in the indictment were not apprehended; there were dismissals as to others; many of those charged have pleaded guilty; and the jury returned a verdict of guilty as to the appellants.

Separate and distinct appeals have been taken on behalf of seven of those convicted in the court below. The same propositions are relied upon by each of the appellants for reversal of the case, and the appeals will be treated in a single opinion; the several appeals having been lodged upon a single record.

The evidence disclosed that soon after the discovery of oil in Pottawatomie and Seminole counties, Okl., and in the latter part of the year 1926, Pottawatomie county attracted numerous persons. Many were engaged in employments in the oil fields within the county; and many persons became engaged in criminality. The officials of the county and of the oil field town, Earlsboro, set out upon a plan of organized crime for the purpose of enriching themselves personally by promoting the traffic in intoxicating liquors upon a most gigantic scale. One of the chief promoters of the scheme was the sheriff of Pottawatomie county, who was convicted in this case and who is not prosecuting an appeal. Homer Knappenberger, the mayor of the town of Earlsboro, a boom oil field town, located in Pottawatomie county, was another. He was convicted in the trial of the case and is not prosecuting an appeal. Deputy sheriffs, constables, sheriffs, and mayors, as well as other officers, were all involved in this scheme and orgy of vice and crime. Decent citizenship was betrayed by trusted officers for more than three years, resulting in a most appalling condition of criminality. By reason thereof crimes were committed; the liquor business was engaged in in open defiance of the laws of the state and nation. The record shows that the dark blight of their unlawful business was so notorious as to be common knowledge of all within the confines of this territory.

The evidence shows that Homer Knappenberger was one of the originators of the conspiracy, which continued until it was terminated by federal officers in the year 1929. Knappenberger was the mayor of Earlsboro. He entered a plea of guilty in the case and testified as a witness for the government. His testimony reveals that he served as mayor of Earlsboro for something like ten years, being a resident and an official of the town during the year 1926, which was the year of the discovery of oil near Earlsboro. The chief of

194

police of Earlsboro, Marion Fuller, a defend-
ant in this case, died about ten days before
the trial. Knappenberger entered into an'
agreement with Fuller, the chief of police, for
the handling of what the witness termed
"joints" in the town of Earlsboro. Fuller
suggested to Knappenberger that money could
be obtained from the joints, without any one,
knowing about it. In pursuance of the ar-
rangement, the chief of police generally col-
lected from $5 to $10 from each place where
intoxicants were handled for protection
against arrest so far as city police were con-
cerned. The chief of police raided all other
places and persons engaged in the liquor traf-
fic who refused to pay a sum of money which
was satisfactory to him. Those who paid the
required sums were not raided, arrested, or
molested. When this conspiracy and agree-
ment was entered into between the mayor and
the chief of police of Earlsboro, there were
only three joints or places where intoxicants
were being sold on the "line" who paid the
required sums to the chief of police and may-
or, but the number increased very rapidly.

One of the appellants, Bob Keys, operated
a drug store in Earlsboro where intoxicants
were sold, and the testimony as to Keys re-
veals that appellant Keys paid the required
sum to the chief of police and mayor for pro-
tection.

Knappenberger further testified that he
was advised by Fuller, chief of police, in De-
cember, 1926, that there was a county "line"
which the witness defined as places where liq-
uor was being sold and handled who were
paying sums of money to county officials for
protection against arrest and raids. Upon
obtaining this information, a discussion of the
subject was had with Frank Fox, the sheriff
of Pottawatomie county; the chief of police
having also discussed it with one Motley, a
deputy sheriff. Sheriff Fox advised Knap-
penberger that Motley was a deputy sheriff
who was employed by the sheriff and Randall
Pittman, county attorney of Pottawatomie
county, to collect sums of money from those
engaged in handling intoxicating liquors. An
arrangement was made by which Motley and
Fuller were to collect all sums of money for
this unlawful purpose and they were assisted
in the collection by one Skinny Grace, who
was introduced into his work by Deputy Sher-
iff Motley. The evidence showed that these
three collectors were so diligent in their ef-
forts that tribute was exacted as many as
three or four times a week from the bootleg-
gers, or from the joints or places where in-
toxicants were handled. In fact, collections

were so frequent that the situation became
alarming to Chief of Police Fuller, and he
was compelled to take the matter up with
Mayor Knappenberger to ascertain what
could be done, because the chief of police
feared that the bootleggers were not going to
stand for the exaction of so much money very
much longer. This resulted in the chief of
police engaging Deputy Sheriff Motley to
arrange a conference with Sheriff Fox. The
conference was held between the sheriff and
the chief of police and deputy sheriff, and it
was agreed that a new schedule of payment
was to be employed, by the terms of which
the town of Earlsboro officers were to receive
$1 on each case of beer and $1 on each gallon
of whisky, and the county officials of Potta-
watomie county were to obtain similar sums
upon all whisky and beer handled within the
county.

The mayor further testified that numerous
sums of money were collected from parties en-
gaged in the sale of intoxicating liquors, as
well as gambling and other crimes. Because
of the extent of vice and crime Pottawatomie
county became notorious; its citizens were
helpless; its local government, because of
corrupt officials, was ineffective to cope with
the situation. An appeal was made to the
Attorney General of the State of Oklahoma,
resulting in the Attorney General sending one
Oscar Gordon, an Assistant Attorney Gener-
al of the State of Oklahoma, to Pottawatomie
county to investigate the town officials of
Earlsboro, including the mayor and chief of
police, and this investigation was conducted
during the month of August, 1927. At the
suggestion of the County Attorney Pittman,
the mayor of Earlsboro paid Gordon, a mem-
ber of the Bar of Oklahoma and an assistant
in the Attorney General's office in this state,
certain sums of money to protect the town of-
ficials from prosecution. Part of the agree-
ment with Gordon was that Fuller, chief of
police, would resign. Fuller complied with
the arrangement by resigning and one Bill
Rigney, another defendant in this case, was
appointed to fill the vacancy. Rigney served
in that capacity for about five months. Dur-
ing his régime as chief of police the manner
of collecting the money from the joints was
changed, in that it was collected as fines and
was paid to the town of Earlsboro.

About June 20, 1928, Clarence Burdette, a
defendant in this case, was appointed chief
of police. About the time of his appointment,
Gordon came back to Pottawatomie county
and demanded $1,000 in addition to what he
had theretofore been paid. This demand re-

sulted in a conference between the mayor and chief of police of Earlsboro and Mr. Gordon was paid the sum he had demanded. Mayor Knappenberger included in his testimony that Chief of Police Burdette was engaged in the operation of a still on the mayor's farm south of the town of Earlsboro and that the chief of police moved about one thousand gallons of whisky to a gin as a place of storage; the mayor having a financial interest in the gin.

Chief of Police Burdette testified on behalf of the government that he went to Pottawatomie county about March 16, 1927, during the time his uncle, Knappenberger, was mayor; that he went to Pottawatomie county for the purpose of engaging in the liquor traffic; that prior to the time of his going to Pottawatomie county, he had been engaged in the liquor traffic in Grady county, Okl., for about four years. He had made an agreement with Deputy Sheriff Motley, Chief of Police Fuller, and Mayor Knappenberger to furnish liquor for Pottawatomie county. This arrangement was made before Burdett became chief of police and while Fuller held that position. The witness advised the officials that he had about four thousand gallons of whisky in Caddo county and was advised by the mayor that Pottawatomie county would be a good place for its sale. He further testified that the appellants John Baugh and Barney Lovette, as well as other defendants in the case, transported the liquor for him into Pottawatomie county. He also testified that Mayor Knappenberger explained to him about the protection afforded by both the town and county officials and also advised him how much money was obtained from those engaged in the liquor business by the town and county officials. His testimony also disclosed that after he became chief of police of Earlsboro he made collections from the joints and from those engaged in the illicit handling of liquor, and that during the time he was chief of police he supplied most of the whisky to the joints and to those operating places where intoxicants were sold.

During the fall 1928, Frank Stewart was elected sheriff of Pottawatomie county, and in the latter part of December of the same year Chief of Police Burdette made an arrangement with the newly elected sheriff, by the terms of which the county would still afford protection to those engaged in the liquor business, upon Sheriff Stewart receiving sums of money, as had his predecessor in office.

The witness testified that appellant Lovette and others urged him to go to Shawnee for the purpose of taking charge of the whole-

sale liquor business for the county. An arrangement was made with appellants Baugh and Lovette, as well as with others, including one W. W. Yoder, in which a conference was held with the county attorney and sheriff, resulting in an agreement by which these two county officials were to receive $1,500 per month. The witness moved into Shawnee, where he actively engaged in the liquor business under arrangements that Sheriff Stewart was to abide by whatever arrangements his predecessor Fox had made with reference to the collection of money from those engaged in the liquor traffic. The witness testified that during the first three months of 1929 about eight thousand gallons of liquor were moved from Grady county to Pottawatomie county and disposed of by him in the latter county. He told of payments of sums of money he had made to former Sheriff Fox subsequent to the conference he had held prior to his removing to Shawnee, and also told of the raid that had been made on the still located on Mayor Knappenberger's farm during the month of April, 1929, by federal officers. He testified about the efforts of Ex-Sheriff Fox to find out who was responsible for the raid and of having a conversation in which Fox had advised him that Sheriff Stewart had instructed Fox to tell two constables, whom they thought were responsible for the raid, to not molest the still.

The testimony of these witnesses, augmented and corroborated by a mass of other evidence, conclusively established the allegations of the indictment that there was formed and entered into in the latter part of 1926, in the town of Earlsboro, a conspiracy to violate the provisions of the National Prohibition Act, and that this conspiracy was active and operating until terminated by federal officers in the year 1929.

Roy Grace, a witness for the government, testified that he had known the appellant Motsenbocher for ten or twelve years and that he was engaged in the liquor business as a bootlegger; that he had assisted appellant Motsenbocher in delivering two cans of alcohol to a drug store operated by appellant Bob Keys; and that prior to the delivery of the alcohol he had been in conversation with Sheriff Fox, in which Fox had advised the witness that appellant Motsenbocher had charge of the alcohol line.

Another witness, Clyde Peddicord, testified that appellant Motsenbocher operated a gambling house and whisky joint and that Motsenbocher advised the witness, in response to a question as to how he was permitted to

engage in the liquor business, that he was a good friend of the county officials.

James H. Webster, who testified for the government, stated that appellant Motsenbocher called at his place of business in an effort to sell the witness whisky, and that on this occasion appellant Motsenbocher stated that if the witness would buy whisky of Motsenbocher, he would arrange protection for him as he had it fixed with the county.

There is an abundance of evidence showing the activities of each of the appellants in the liquor traffic, which they conducted under the protection afforded them by town and county officers. It is unnecessary to further detail the activities of each of the appellants, as the record shows that each of them actively participated in violating the National Prohibition Act, and that in doing so they were acting in combination with the town and county officials, who had planned to permit the violation of the Prohibition Law.

The first proposition relied upon by appellants for reversal of the case is that the evidence was wholly insufficient to connect appellants, defendants below, with the alleged conspiracy and that the trial court erred in overruling the motion of appellants for directed verdicts.

The second proposition presented by appellants is that there was a variance between the allegations of the indictment and the proof; that two or more distinct and unrelated conspiracies were established by the evidence; and that the trial court committed error in denying appellants' motion for directed verdict, because of the fatal variance in the allegations of the indictment and the proof.

The third proposition urged for a reversal is that the trial court erred in refusing defendants' instructions as to the law applicable to two or more separate and independent conspiracies.

■ The evidence amply supports the verdict of the jury as to all the appellants herein. Defendants' guilt is for the jury to determine where substantial evidence is presented from which guilt could legitimately be found. Rosenthal v. U. S. (8 C. C. A.) 45 F.(2d) 1000; Holt v. U. S. (7 C. C. A.) 45 F.(2d) 392.

■ The record in this case discloses that there is no merit in the appellants' first proposition. There was sufficient evidence to go to the jury and the demurrer of the appellants to the evidence and their motions for directed verdicts were properly overruled and denied by the trial court.

In support of the second proposition of appellants, that there was a fatal variance in the allegations of the indictment and the proof, the case of Marcante v. U. S. (C. C. A.) 49 F.(2d) 156, is relied upon. Judge McDermott in delivering the opinion of the court in that case said: "There is no doubt that there can be a conspiracy to violate the liquor laws in a dozen different localities; such a conspiracy may be a continuing one; actors may drop out, and others drop in; the details of operation may change from time to time; the members need not know each other, or the part played by others; a member need not know all the details of the plan or the operations; he must, however, know the purpose of the conspiracy and agree to become a party to a plan to effectuate that purpose. A conspiracy is bottomed on an agreement to accomplish an illegal act, and without such agreement there can be no conspiracy; a conspiracy 'is a partnership in criminal purposes.' United States v. Kissel, 218 U. S. 601, 31 S. Ct. 124, 126, 54 L. Ed. 1168; Brown v. Elliott, 225 U. S. 392, 32 S. Ct. 812, 56 L. Ed. 1136; McDonnell v. United States (C. C. A. 1) 19 F.(2d) 801; Allen v. United States (C. C. A. 7) 4 F.(2d) 688; Rudner v. United States (C. C. A. 6) 281 F. 516."

The rule as contended for by the government is clearly recognized and approved in this opinion; but the court, upon the facts in this case, concluded that the government had failed to establish that a general statewide conspiracy existed as charged in the indictment. It is true the state law enforcement commissioner, one of the defendants, had solicited and accepted bribes from liquor dealers in the several cities and towns of Wyoming, but because of disassociation of the various defendants and localities with each other, and the failure of the proof to establish that the various groups were cooperating in their efforts to accomplish the alleged unlawful acts, it was held the government had failed to establish a statewide general conspiracy as charged.

■ In the instant case the proof clearly brings the case within the rule announced in Allen v. U. S. (C. C. A.) 4 F.(2d) 688, 691. In this case a conspiracy between officers of the law to sell protection throughout the town of Gary, Ind., was established, and the defendants knowing of such a general conspiracy entered therein. Judge Evans, speaking for the court in the case, supra, said: "A conspiracy may be established by circumstantial evidence or by deduction from facts. The common design is the essence of the crime, and

this may be made to appear when the parties steadily pursue the same object, whether acting separately or together, by common or different means, but ever leading to the same unlawful result. If the parties acted together to accomplish something unlawful, a conspiracy is shown, even though individual conspirators may have done acts in furtherance of the common unlawful design apart from and unknown to the others. All of the conspirators need not be acquainted with each other. They may not have previously associated together. One defendant may know but one other member of the conspiracy. But if, knowing that others have combined to violate the law, a party knowingly co-operates to further the object of the conspiracy, he becomes a party thereto."

It cannot be seriously doubted from a consideration of all the evidence in the case here that the appellants, and the other defendants, engaged in the unlawful sale, manufacture, and transportation of intoxicating liquors from the beginning to the termination of the conspiracy charged in the indictment by the payment of protection money to the officers of the law, co-operated and united their efforts towards the ultimate object of being able to carry on their criminal business under the official protection of such officers, and as a part of the common scheme to have destroyed any competition not operating under such protection. Merely changing the details, or manner of collecting the protection money, or the personnel of the retailers and wholesalers engaged in the liquor business, did not affect the ultimate object of the conspiracy.

■ We do not think there there is a variance in the allegations of the indictment and the proof, as the evidence supported the allegations of the indictment. True it is that certain members charged with the conspiracy did not know other members, and probably did not know the details of the plan, or the extent of the operations. Each of them, however, clearly understood the purpose of the conspiracy, to wit, to engage in the liquor traffic in defiance of the laws of the state and nation, and had joined in the conspiracy, by either paying or receiving money to aid in such law violation. We, therefore, conclude that there is no merit in the second proposition urged by appellants.

■ The third proposition is that the court erred in refusing defendants' instructions as to the law applicable to two or more separate and independent conspiracies. We have carefully examined the instructions of the court, and it appears they very fully and fairly

stated the law applicable to the case. The theory of the government as to one general continuing conspiracy and of the defendants as two or more separate and independent conspiracies was fully covered by the court's general instructions. The refusal of a requested instruction covered by instructions given constitute no error. Haffa v. U. S. (C. C. A.) 36 F.(2d) 1, certiorari denied 281 U. S. 727, 50 S. Ct. 240, 74 L. Ed. 1144; Spalitto v. U. S. (8 C. C. A.) 39 F.(2d) 782.

■ The last proposition urged is that the trial court committed fundamental error in its instructions to the jury concerning the disposition of the case as to certain of the defendants. In the instruction complained of, the trial court advised the jury as to the disposition of the case as to certain defendants who had entered pleas of guilty, and as to the sustaining of demurrers and motions for directed verdicts as to other defendants. No objections or exceptions were interposed to this instruction. It is the duty of a defendant to take his exceptions to the charge of the court in the presence of the jury before it retires to consider its verdict. Elderd v. U. S. (C. C. A.) 44 F.(2d) 170.

■ There is some qualification of this general rule where prejudicial error is obvious in a criminal case, and a failure to consider such error would result in a miscarriage of justice. An appellate court should of its own motion recognize and consider such errors. The reason for this qualification of the general rule is that it is the duty of the courts to give protection against unlawful deprivation of liberty. Danaher v. U. S. (C. C. A.) 39 F.(2d) 325.

■ It is not the duty of appellate courts to recognize merely technical errors that have not resulted in a miscarriage of justice. In the case of Blair et al. v. U. S., 32 F.(2d) 130, 134 (8 C. C. A.) the court held: "Some objection is urged to the charge, but it refers to a matter which is not vital, but only incidental, and so, since no objection was made and no exception taken to the charge, we are not bound to notice it."

■ The trial of this case required three weeks in time and involved a large number of defendants. It is extremely difficult to try such cases. The practice of submitting to a jury in one trial the question of the guilt of a large number of persons, where the testimony to each is different, was properly condemned by this court in Marcante et al. v. United States, supra. We are of the opinion, however, in the present case, that upon the

whole record the defendants were accorded a fair and impartial trial, and the errors, if any committed, were only incidental.

The case is affirmed as to all the appellants.

LEWIS, Circuit Judge (dissenting).

In this case one of the appellants, Motsenbocher, was sentenced to two years imprisonment and to pay a fine of $1,000. Each of the other six was sentenced to eighteen months imprisonment and two of them to pay fines of $500. The indictment charged appellants and ninety-five others named, several of them women and others whose names were unknown to the Grand Jurors, conspired and agreed together and each with the other to commit offenses against the United States in that they would violate the National Prohibition Act (27 USCA) in unlawfully manufacturing, possessing, transporting, selling, and giving away intoxicating liquors, to-wit, beer, whisky, and alcohol; and that said unlawful conspiracy continued from October 1, 1926, to September 20, 1929. Twenty-six overt acts are set up as having been done by one or more conspirators in pursuance of and to effect the object of the conspiracy. The first overt act in time, as charged, was on June 25, 1927.

Violations of the National Prohibition Act were flagrant, widespread, long continued, and in the open. Intoxicants were sold in drug stores, restaurants, automobile filling stations, cigar stores, pool halls, speak-easies, dance halls, etc. by men and women. Innumerable convictions for violations of the Prohibition Law could have been obtained easily for manufacture, transportation, sale, and possession. But the prosecution adopted the more difficult course of trying to encompass the whole situation by charging a conspiracy. That offense is defined by section 88, title 18, U. S. Code (18 USCA § 88): "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

The prosecution to sustain the charge that the conspiracy was formed called Ruth Morgan May as a witness. She testified that she, Oscar Motley, a deputy sheriff, one Adamson, and Duce Baron met one evening in November or December, 1926, in back of Keys' drug store in Earlsboro, and organized a whisky "line" in Earlsboro; that Baron said to Motley, "I don't see any reason why we can't make money out of this. Everything seems to be going along fairly well." That Motley said, "We will see you at a later date." That witness and Motley talked the matter over and agreed it would be the very thing to do to make money, and the next day they went to Tecumseh and saw Frank Fox, the sheriff; that after Motley talked with Fox about it, Fox said, "That will be all right with me"; and she and Motley went back to Earlsboro, Fox got busy on the whisky "line" and got everything organized. They agreed on a certain price for whisky, $10 a gallon, and when the beer season opened up it was to be $6 per case. Roy Grace, Marion Fuller, and Red Borders were to have charge of the collections; that she and Motley made some of the collections from those selling intoxicants; that they divided the collections into three parts, the county and the city and then Motley held out a part of it. She turned over the city's part to the mayor. That the county's part went to Fox, the sheriff, and Pittman, the county attorney. She produced accounts which she testified she kept at the direction of Motley showing sums to be paid to the parties that have been named, also to one Bill Rigney; also accounts showing from whom and the amounts collected from time to time from those who she testified were selling intoxicants. This constituted an unlawful conspiracy expressly proven.

But the prosecution then called Knappenberger, mayor of Earlsboro, and he testified that along in December, 1926, Marion Fuller, chief of police, came to him and said, "Let's get some money from these joints. We can collect off of these joints, and nobody will be none the wiser, and get this money." The conversation was in the mayor's office. The witness finally agreed with Fuller, the latter was to do the collecting; that Fuller went ahead and collected from the joints where intoxicants were being sold charging them $5 to $10 per week for protection as far as the city police were concerned. They raided anyone who didn't pay what they thought was enough. He gave the names of a number of persons who were selling intoxicants and from whom collections were made. He later found that there was a county "line." The mayor then went to see Sheriff Fox, and they agreed to cooperate, and the amount to be thereafter collected was left to Motley and Fuller. The city was to get a dollar on each case of beer and a dollar on each gallon of whisky, and the county a like amount. The amount to be

collected from retailers was to be divided between the county and city (those who pretended to represent the city and county). Fox, sheriff, and Pittman, county attorney, were supposed to represent the county. Thus the testimony of Knappenberger was direct proof of the formation of a conspiracy, separate and independent of the conspiracy shown by the testimony of Ruth Morgan May.

The prosecution then called Clarence Burdette as a witness and by him established another and different conspiracy. He testified that late in December, 1928, or early in January, 1929, San Hunnicutt, Barney Lovette, and Jack Dunn came to him in his restaurant at Earlsboro and told him they wanted him to go to Shawnee; that they had it fixed over there so they could get city and county protection; that they wanted him to move over there and take charge of the wholesale business; that it would cost $1,500 a month to get it. He went to Shawnee in a day or so thereafter and met the three persons named, also John Baugh and Ollie Yoder. The latter was the brother of the chief of police of Shawnee. Frank Stewart had succeeded or was about to succeed Frank Fox as Sheriff of Pottawatomie County, and it was thought necessary to bring him into the agreement. Burdette went to see Stewart, and he became a party. The sum of the understanding between these parties was that Burdette should pay $1,000 monthly for the exclusive right to sell whisky throughout the county to those who retailed it. Frank Fox also became a party to this agreement by being designated as the one to whom Burdette would make payments, which was done. Burdette then moved to Shawnee, rented a residence there, and rented a room in the business section in which he stored whisky in large quantities, bringing it in in trucks and automobiles, and from that point he distributed it as called for throughout the county.

This, it is observed, is direct proof of another separate conspiracy from those that had been entered into as shown by the testimony of Ruth Morgan May and Knappenberger. No two of them were between the same parties. The purpose of the first one was to give protection as far as that could be done to both wholesaler and retailer of intoxicants throughout the county, the purpose of the second one was to give protection only to retailers in Earlsboro, and the one last mentioned only to a named wholesaler throughout the county. The indictment charged only one conspiracy. It was obviously improper and prejudicial to prove more than one conspiracy in support of the charge. It was impossible for appellants to know of what conspiracy they were found guilty.

The offense charged in the indictment and defined by the statute consists of two elements, the conspiracy and an overt act or acts by one or more of the conspirators to effect its purpose. The crime is not complete and cannot be committed or prosecuted until after the overt act; and proof of the two elements is all that is necessary to establish the charge. Hyde v. United States, 225 U. S. 347, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Brown v. Elliott, 225 U. S. 392, 32 S. Ct. 812, 56 L. Ed. 1136; Joplin Mercantile Co. v. United States, 236 U. S. 531, 35 S. Ct. 291, 59 L. Ed. 705. The conspiracy is a different offense from the crime that is the object of the conspiracy, and appellants were not tried and convicted for committing the latter. A plain case within the statute would be an agreement between a given number of persons to go into the business of retailing intoxicants in a named town or territory, although each might have a separate part in carrying out the general purpose—some to make arrangement for places of sale, others to procure the necessary help in making the sales, others to provide for the manufacture or purchase of the intoxicants to be sold, and others to transport it to the places of sale. But that was not the situation here. When the several conspiracies shown in this record were entered into, sales of intoxicants at speak-easies, pool halls, and other places in the territory of new oil discoveries were being carried on. The conspirators did not call the proprietors of these places together, nor so far as the record shows did they confer with any of them in the way of inducing them to enter into or continue the business in which they were then engaged. They simply agreed to levy tribute on these retailers, and for that purpose county officials or city officials were members of each proven conspiracy, and the conspirators enforced their demands by raiding places that did not make payments as demanded. It was thus entirely unnecessary that retailers should become members of the conspiracy or conspiracies. Some if not all of the appellants were already engaged in violating the Prohibition Law, and those who came in as retailers after the conspiracies were formed were likewise compelled to accede to the demands. It is a misconception in principle to say that merely paying tribute made the retailers parties to the proven conspiracies, or that their yielding constituted proof that they had entered into a conspiracy previously formed. So far as the record

200

shows they may have yielded only to avoid arrest, without knowledge of an existing conspiracy. There is no proof that the retailers knew how or when or by whom it was determined they were to make the payments exacted of them. Conceding a separate conspiracy between each retailer and the collector, that does not tend to prove the conspiracy charged.

Of course, one may become a party to a conspiracy after it is formed, and that he has done so may be shown by facts and circumstances as well as by direct proof. As said by this court in Marcante v. United States, 49 F.(2d) 156, 157, he need not know all the details of the plan, but: "He must, however, know the purpose of the conspiracy and agree to become a party to a plan to effectuate that purpose. A conspiracy is bottomed on an agreement to accomplish an illegal act, and without such agreement there can be no conspiracy; a conspiracy 'is a partnership in criminal purposes.'" Again, in Allen v. United States (C. C. A.) 4 F.(2d) 688, 691: "They [the conspirators] may not have previously associated together. One defendant may know but one other member of the conspiracy. But if, knowing that others have combined to violate the law, a party knowingly co-operates to further the object of the conspiracy, he becomes a party thereto."

The principle is elementary. There was no direct proof that appellants, except Baugh and Lovette, who were present at the Shawnee conspiracy, knew of the formation of any of these conspiracies. Motsenbocher never paid anything for protection. Where an incriminating fact is sought to be established by circumstantial proof, that proof to be sufficient for the intended purpose must exclude every other reasonable hypothesis than that of the existence of the incriminating fact. I think there was no such proof in this case. There is another established principle in criminal law—when two inferences are each reasonably deducible from proof, one against a defendant and the other in his favor, the latter must be accepted. Those who were engaged in selling intoxicants at retail probably knew that county and city officials were interested in demands of contribution from them. Motley, deputy sheriff, and Fuller, chief of police, made some of these collections. They likely knew that they would be arrested and their places raided by local officers, if they did not pay what was demanded. Is it not just as reasonable to infer that they would have yielded and did yield without knowledge of any of the proven conspiracies

as with knowledge thereof? And, of course, without such knowledge, express or implied, they did not and could not become members of either of the proven conspiracies. Dahly v. United States (C. C. A.) 50 F.(2d) 37; Dickerson v. United States (C. C. A.) 18 F. (2d) 887; Young v. United States (C. C. A.) 48 F.(2d) 26; Niederluecke v. United States (C. C. A.) 21 F.(2d) 511; McLaughlin v. United States (C. C. A.) 26 F.(2d) 1. And so I conclude the judgments as to all appellants should be reversed.